ACCEPTED
13-15-00506-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
5/12/2016 3:07:01 PM
Dorian E. Ramirez
CLERK

IN THE

# Thirteenth Court of Appeals

CORPUS CHRISTI AND EDINBURG, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
5/12/2016 3:07:01 PM
DORIAN E. RAMIREZ
Clerk

## No. 13-15-00506-CV

---

SCRIPPS NP OPERATING, LLC,
A WISCONSIN LIMITED LIABILITY
COMPANY, SUCCESSOR IN INTEREST
TO SCRIPPS TEXAS NEWSPAPERS, LP
D/B/A CORPUS CHRISTI CALLER-
TIMES
AND THE E.W. SCRIPPS CO.,

*Appellants,*

— v. —

TERRY CARTER,

*Appellee*

Interlocutory appeal from
The 214th District Court
Nueces County, Texas

The Honorable Jose Longoria
Presiding

---

## TERRY CARTER'S BRIEF

---

Bryan A. Garner
Tex. Bar No. 07672000
Karolyne H.C. Garner
Tex. Bar No. 24053883
Carol T. Jackson
Tex. Bar No. 00797783
14180 Dallas Parkway
Suite 280
Dallas, TX 75254
Tel.: (214) 691-8588
Fax: (214) 691-9294

E-mail:
  bgarner@lawprose.org
  kcheng@lawprose.org
  tjackson@lawprose.org

René Rodriguez
Tex. Bar No. 17148400
LAW OFFICE OF RENÉ
  RODRIGUEZ
433 S Tancahua Street
Corpus Christi, TX 78401

Craig S. Smith
Tex. Bar No. 18553570
LAW OFFICES OF CRAIG S.
  SMITH
14493 S.P.I.D. Suite A
P.M.B. 240
Corpus Christi, TX 78418
Tel.: (361) 728-8037
E-mail:
  ccslaw@stx.rr.com

# Table of Contents

Table of Authorities.................................................................................iii

Questions Presented..............................................................................vi

Statement About the Record...................................................................vii

List of Parties and Other People............................................................viii

Index to Appendixes ..............................................................................x

Introduction..........................................................................................21

Statement of Facts ..................................................................................3

Summary of Argument...........................................................................13

Standard of Review...............................................................................14

Argument ..............................................................................................16

    A. Substantial evidence shows that the articles are collectively
       defamatory and defamatory per se. ...............................................16

        1. Ample evidence shows that the Caller-Times' articles were not
           substantially true. ..................................................................17

        2. The publications are not constitutionally protected opinion. ...............24

        3. The judicial-proceeding privilege does not shield the Caller-Times. ...27

    B. There is evidence aplenty of actual malice, recklessness, and
       negligence—and all factual inferences are to be drawn in Carter's
       favor. ..............................................................................................29

        1. The Caller-Times' publisher had motives to attack Carter....................30

        2. The Caller-Times selectively omitted material facts and juxtaposed
           facts with innuendo. ..............................................................35

    3.  The Caller-Times deliberately avoided the truth. ...................................39

    4.  The Caller-Times recklessly or negligently relied on sources it
        should have known were questionable. ......................................................42

C.  A jury could find from the evidence that there was a conspiracy to
     defame Carter, to prevent the Chamber from renewing Carter's
     employment contract, and to drive him to resign. .......................................56

D.  Because the owner of a media outlet is liable for the outlet's wrongful
     act, Scripps is liable for the Corpus Christi Caller-Times' defamatory
     articles. .......................................................................................................61

Conclusion .............................................................................................................62

# Table of Authorities

**Cases**

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) .......... 14, 16, 25, 29, 34, 37, 38, 39

*Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711 (Cal. 1989) ...........................................61

*Buck v. Palmer*, 381 S.W.3d 525 (Tex. 2012) .................................................13

*Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989)..................................................13

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ................................................34

*Chapman v. King Ranch, Inc.*, 41 S.W.3d 693 (Tex. App.—Corpus Christi 2001), *rev'd on other grounds*, 118 S.W.3d 742 (Tex. 2003)..............................vii

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005) ...........................................13

*Denton Pub. Co. v. Boyd*, 460 S.W.2d 881 (Tex. 1970)..........................................27

*Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005)....................13

*Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex. 1976) ...........................28

*Franco v. Cronfel*, 311 S.W.3d 600 (Tex. App. 2010)...................................... 34, 38

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ....................................................... 28, 34

*Golden Bear Distrib. Sys. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir. 1983) .........35

*Guisti v. Galveston Tribune*, 150 S.W. 874 (Tex. 1912)..........................................14

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989)....29, 37, 38, 40, 41

*Hearst Corp. v. Skeen*, 159 S.W.3d 633 (Tex. 2005)..............................................29

*Hooper-Holmes Bureau v. Bunn*, 161 F.2d 102 (5th Cir. 1947) ....................... 17, 60

*Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413 (Tex. 2000) ............... 34, 35

*Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963) ................... 55

*Kapellas v. Kofman*, 459 P.2d 912 (Cal. 1969) ....................................................... 14

*Masson v. New Yorker Mag.*, 501 U.S. 496 (1991) ................................................. 16

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990) ......................................... 24

*Moore v. Waldrop*, 166 S.W.3d 380 (Tex. App.—Waco, 2005, no pet.) ............. 15

*Musser v. Smith Protective Servs.*, 723 S.W.2d 653 (Tex. 1987) ...................... 14, 29

*Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013) ......................... 17, 22, 23, 27, 28, 60

*Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71
   (Tex. App.—Houston [1st Dist.] 2013) (no pet.) ........................... 28, 37, 38

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ........................................... 28

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376
   (1973) ................................................................................................................. 60

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74 (Tex.
   2000) ................................................................................................................. 59

*Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302 (Tex. 1982) ............... 13

*Scripps Texas Newspaper, LP v. Carter*, 13-09-00655-CV, 2012 WL 5948955
   (Tex. App.—Corpus Christi, Nov. 21, 2012, pet. denied) ......................... 27

*St. Amant v. Thompson*, 390 U.S. 727 (1968) ........................................................ 41

*Sudan v. Sudan*, 199 S.W.3d 291 (Tex. 2006) ....................................................... 13

*Turner v. KTRK Television, Inc.*, 38 S.W.3d 103
   (Tex. 2000) ................................................... 13, 14, 15, 16, 17, 24, 28, 34, 35

*Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005) ........................... 13

*Vice v. Kasprzak*, 318 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 1979, pet. denied) ................................................................................15

*Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) .....................52

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998) ..............................52

*Zacchini v. Scripps-Howard Broadcasting, Inc.*, 351 N.E.2d 454 (Ohio 1976) ........60

*Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987) ........................36

## Statutes

Tex. Civ. Prac. & Rem. Code § 73.002 ..............................................................27

Tex. Penal Code § 31.03 ................................................ 9, 16, 18, 37, 48

Tex. Penal Code § 32.32 ................................................ 9, 18, 20, 37, 48

Tex. Penal Code § 32.45 .................................. 9, 16, 18, 19, 25, 37, 48

## Rules

Tex. R. Civ. P. 166a ..........................................................................................13

Tex. R. Civ. P. 58 ...........................................................................................vii

## Other Authorities

Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* (2016) ............................................................................... 20, 24

19 C.J.S. *Corporations* ......................................................................................60

*Merriam-Webster's Collegiate Dictionary* (11th ed.) ..................................................20

Restatement (First) of Agency (1933) .......................................................... 17, 60

W. Page Keeton et al., *Prosser & Keeton on Torts* (Supp. 1988) ..........................35

# Questions Presented

**A. No truth and not opinion.** In an editorial containing nothing to suggest that the statements were other than facts, the Caller-Times implied Carter had committed at least three felonies. For these statements, the Caller-Times has shown neither that the statements were true (or even believed to be true) nor that an ordinary reader would not perceive criminal acts. Has it proved a defense of truth or opinion?

**B. No privilege applies.** The judicial-proceeding privilege expressly protects reports of judicial proceedings and the proceedings of public meetings. In at least 21 articles, the Caller-Times reported about Chamber of Commerce meetings that were not public meetings. Does the judicial-proceeding privilege apply to these articles?

**C. Actual malice.** Evidence of actual malice is sufficient if it permits the conclusion that the alleged defamer made the false publication with a high degree of awareness of probable falsity or with reckless disregard of whether it was true. The Caller-Times selectively omitted or juxtaposed material facts to create a false impression, purposefully avoided learning the truth, and ignored obvious reasons to doubt the veracity of a source. Is there evidence of actual malice?

**D. Recklessness and negligence.** Recklessness is shown when appellants knew that the statements made were false. Negligence is the failure to investigate a statement's falsity and act as a reasonably prudent person. Although a Caller-Times reporter admitted listening to a tape in which Bentley talked at length with an accountant, she published an article claiming that Bentley had been denied access to that accountant. Is there evidence of recklessness or negligence?

## Statement About the Record

Record cites in this brief are to the black, typed numbers on the bottom right of each page. This case has been briefed and rebriefed in this Court and the Supreme Court of Texas. There are three numbers on the bottom of many pages in the record. These include a red number on the bottom left of many pages. The red numbers were placed by the Supreme Court of Texas in the first appeal. Handwritten numbers were placed on the bottom right of many pages by the Nueces County District Clerk. This created the Clerk's Record in the first appeal.

This Clerk's Record is Bates-stamped with black, typed numbers on the bottom right of each page. There are 12,763 pages in this Clerk's Record numbered sequentially. Many pages are verbatim copies of the Clerk's Record in the first appeal. The great length of this Clerk's Record is necessary because it contains the proof that there is no new material evidence in this appeal, and all of the Caller-Times' complaints were or could have been raised in the first appeal.

Where necessary, Carter has referred to his previously filed summary-judgment response and attached evidence,[1] and Brief on the Merits in the Supreme Court of Texas.[2]

---

1    2CR4199.
2    *Chapman v. King Ranch, Inc.*, 41 S.W.3d 693 (Tex. App.—Corpus Christi 2001), *rev'd on other grounds*, 118 S.W.3d 742 (Tex. 2003) (holding parties may incorporate by reference other summary-judgment pleadings and evidence); Tex. R. Civ. P. 58.

## List of Parties and Other People
## (Alphabetically by Last Name)

| Name | Role |
|---|---|
| Elvia Aguilar | Reporter, *Corpus Christi Caller-Times* |
| Libby Averyt | Vice-president, *Corpus Christi Caller-Times* |
| Mike Baird | Columnist, *Corpus Christi Caller-Times* |
| Damon Bentley | Treasurer, Corpus Christi Chamber of Commerce |
| Patrick Birmingham | President and publisher, *Corpus Christi Caller-Times* |
| Terry Carter | President and CEO, Corpus Christi Chamber of Commerce |
| Mary Ann Cavazos | Reporter, *Corpus Christi Caller-Times* |
| Fanny S. Chirinos | Reporter, *Corpus Christi Caller-Times* |
| Shane Fitzgerald | Editor, *Corpus Christi Caller-Times* |
| Beth Francesco | Assistant editor, *Corpus Christi Caller-Times* |
| Judy Hawley | Former executive-board member, Corpus Christi Chamber of Commerce |
| Van Huseman | Attorney, Corpus Christi Chamber of Commerce |
| Nick Jiminez | Editorial page editor, *Corpus Christi Caller-Times* |
| Freddie Martinez | Chairman, Corpus Christi Chamber of Commerce |
| Tony Pederson | Expert witness for the Caller-Times |
| Jaime Powell | Reporter, *Corpus Christi Caller-Times* |
| Lucy Reta | Employee, Corpus Christi Chamber of Commerce |

| | |
|---|---|
| Israel Saenz | Reporter, *Corpus Christi Caller-Times* |
| Darrell Thompson | CPA, Corpus Christi Chamber of Commerce |
| Tom Whitehurst | Editor, *Corpus Christi Caller-Times* |
| Sylvia Whitmore | Former executive-board member, Corpus Christi Chamber of Commerce |

# Index to Appendixes

**1  Terry Carter's First Affidavit. 2CR2684; 4CR5401.**

**2  Terry Carter's Second Affidavit. 6CR12165.**

**3  *Corpus Christi Caller-Times* Articles**

**A**   Kimberly Vetter, "Chamber Picks New Chief," *Corpus Christi Caller-Times*, 24 June 2004. 2CR1460.

**B**   Beth Wilson, "City Undecided About Incentives for Westside Mall," *Corpus Christi Caller-Times*, 10 June 2007, at A1. 2CR1463.

**C**   Elvia Aguilar & Beth Wilson, "Council Puts Off Vote on Tax Aid," *Corpus Christi Caller-Times*, 13 June 2007. 2CR1467.

**D**   Elvia Aguilar, "Tax Incentives Split Opinions of Chambers," *Corpus Christi Caller-Times*, 15 June 2007. 2CR1470.

**E**   Elvia Aguilar & Beth Wilson, "Coastcon Pulls Out of Chamber," *Corpus Christi Caller-Times*, 19 June 2007. 2CR1473.

**F**   Elvia Aguilar, "Chamber Seeks Level Playing Field," *Corpus Christi Caller-Times*, 23 June 2007, at A1, 8. 2CR1476.

**G**   Libby Averyt, "The City Must Look Beyond Southside," *Corpus Christi Caller-Times*, 24 June 2007, at A20. 2CR1479.

**H**   Elvia Aguilar, "Tax Incentives Ok'd for Mall," *Corpus Christi Caller-Times*, 24 Oct. 2007, at A1, 6. 2CR1481.

**I**   Denise Malan, "Call to chief leads to badge inquiry," *Corpus Christi Caller-Times*, 26 Oct. 2007. 2CR1484.

**J**   Aguilar & Fanny S. Chirinos, "The Caller-Times Leaves Chamber," *Corpus Christi Caller-Times*, 19 Dec. 2007. 2CR1487.

**K**   Jaime Powell, "Financial, management questions raised at CC Chamber," *Corpus Christi Caller-Times*, February 15, 2008. 2CR1490.

**L**  Jaime Powell, "Chamber pulls two off panel," *Corpus Christi Caller-Times*, February 16, 2008, at A1, 7. 2CR1493.

**M**  Elvia Aguilar, "CC Chamber meeting to discuss financial irregularities," *Corpus Christi Caller-Times*, February 20, 2008. 2CR1496.

**N**  Elvia Aguilar, "Financial questions lead to call for audit," *Corpus Christi Caller-Times*, February 21, 2008, at A1, 7. 2CR1498.

**O**  Elvia Aguilar, "Chamber CEO shifted funds, letter says," *Corpus Christi Caller-Times*, February 27, 2008, at A1, 7. 2CR1500.

**P**  Elvia Aguilar, "Ex-chair airs her Chamber concerns," *Corpus Christi Caller-Times*, February 29, 2008, at A1, 7. 2CR1503

**Q**  Editorial [unsigned], "Chamber CEO's actions raise serious questions," *Corpus Christi Caller-Times*, March 2, 2008, at A20. 2CR1506.

**R**  Elvia Aguilar, "Petition seeks Chamber changes," *Corpus Christi Caller-Times*, March 3, 2008, at A1, 5. 2CR1508.

**S**  Elvia Aguilar, "About 80 sign petition on Chamber operation," *Corpus Christi Caller-Times*, March 4, 2008, at A1, 7. 2CR1511.

**T**  Elvia Aguilar, "Chamber board, CEO to enter talks," *Corpus Christi Caller-Times*, March 8, 2008, at A1, 7. 2CR1514.

**U**  Elvia Aguilar, "Chamber treasurer granted temporary restraining order protecting tape," *Corpus Christi Caller-Times*, March 19, 2008. 2CR1516.

**V**  Elvia Aguilar, "Chamber unrest ends up in court," *Corpus Christi Caller-Times*, March 20, 2008, at A1, 6. 2CR1518.

**W**  Elvia Aguilar, "Chamber to discuss petitioners' concerns," *Corpus Christi Caller-Times*, March 21, 2008. 2CR1520.

**X**  Elvia Aguilar, "Chamber puts CEO on paid leave," *Corpus Christi Caller-Times*, March 26, 2008. 2CR1523.

**Y**  Elvia Aguilar, "Chamber CEO on paid leave," *Corpus Christi Caller-Times*, March 27, 2008, at A1, 6. 2CR1526.

**Z**  Elvia Aguilar, "Judge unifies filings on Chamber events," *Corpus Christi Caller-Times*, March 27, 2008, at A6. 2CR1527.

**AA**  Elvia Aguilar, "Chamber finances moved to forefront," *Corpus Christi Caller-Times*, March 31, 2008. 2CR1529.

**BB**  Elvia Aguilar & Fanny S. Chirinos, "Chamber had deficit, board tells members," *Corpus Christi Caller-Times*, April 1, 2008. 2CR1532.

**CC**  Elvia Aguilar, "Chamber, in need of audit, renews accountant search," *Corpus Christi Caller-Times*, April 29, 2008, at D1. 2CR1536.

**DD**  Elvia Aguilar, "Chamber offers contract settlement to Carter, his attorney says," *Corpus Christi Caller-Times*, May 2, 2008. 2CR1538.

**EE**  Elvia Aguilar, "Chamber makes offer, Carter's attorney says," *Corpus Christi Caller-Times*, May 3, 2008, at D1. 2CR1540.

**FF**  Fanny S. Chirinos, "Chamber, Carter's attorney confirm severance agreement," *Corpus Christi Caller-Times*, May 23, 2008. 2CR1542.

**GG**  Fanny S. Chirinos, "Carter's salary to be paid in full," *Corpus Christi Caller-Times*, May 24, 2008, at A1, 11. 2CR1545.

**HH**  Fanny S. Chirinos, "Release of chamber audio recording sought," *Corpus Christi Caller-Times*, May 28, 2008, at B2. 2CR1547.

**II**  Mary Ann Cavazos, "Judge orders that chamber tape recording be released today," *Corpus Christi Caller-Times*, May 30, 2008. 2CR1549.

**JJ**  Mary Ann Cavazos, "Chamber tape tells of heated exchange," *Corpus Christi Caller-Times*, May 31, 2008, at A1, 5. 2CR1551.

**KK**  Mary Ann Cavazos, "Ex-Chamber CEO's mediation to continue," *Corpus Christi Caller-Times*, June 13, 2008, at D1. 2CR1553.

**4  Other News Article:** John Kelley, "Opponents described as 'lynch mob,'" *We the People*, 2 Apr. 2008. 1CR1555.

**5  Chamber of Commerce Newsletter:** Terry Carter, "Will Someone Please Set the Record Straight?" *Your Corpus Christi Chamber News*, 22 June 2007. 2CR1559.

**6  Texas Penal Code**

**A**    Tex. Penal Code § 31.03.

**B**    Tex. Penal Code § 32.32.

**C**    Tex. Penal Code § 32.45.

**7  Miscellany**

**Cited Cases**

- *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002).

- *Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711 (Cal. 1989).

- *Buck v. Palmer*, 381 S.W.3d 525 (Tex. 2012).

- *Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989).

- *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942).

- *Chapman v. King Ranch, Inc.*, 41 S.W.3d 693 (Tex. App.—Corpus Christi 2001), rev'd on other grounds, 118 S.W.3d 742 (Tex. 2003).

- *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005).

- *Denton Pub. Co. v. Boyd*, 460 S.W.2d 881 (Tex. 1970).

- *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005).

- *Foster v. Laredo Newspapers*, 541 S.W.2d 809 (Tex. 1976).

- *Franco v. Cronfel*, 311 S.W.3d 600 (Tex. App.—Austin 2010, no pet.).

- *Garrison v. Louisiana*, 379 U.S. 64 (1964).

- *Golden Bear Distrib. Sys. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir. 1983).

- *Guisti v. Galveston Tribune*, 150 S.W. 874 (Tex. 1912).

- *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 (1989).

- *Hearst Corp. v. Skeen*, 159 S.W.3d 633 (Tex. 2005).

- *Huckabee v. Time Warner Entm't, Co.*, 19 S.W.3d 413 (Tex. 2000).

- *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963).

- *Kapellas v. Kofman*, 459 P.2d 912 (Cal. 1969).

- *Masson v. New Yorker Mag.*, 501 U.S. 496 (1991).

- *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).

- *Moore v. Waldrop*, 166 S.W.3d 380 (Tex. App.—Waco, 2005, no pet.).

- *Musser v. Smith Protective Servs.*, 723 S.W.2d 653 (Tex. 1987).

- *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013).

- *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013) (no pet.).

- *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

- *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973).

- *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74 (Tex. 2000).

- *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302 (Tex. 1982).

- *Scripps Texas Newspaper, LP v. Carter*, 13-09-00655-CV, 2012 WL 5948955 (Tex. App.—Corpus Christi, Nov. 21, 2012, pet. denied).

- *St. Amant v. Thompson*, 390 U.S. 727 (1968).

- *Sudan v. Sudan*, 199 S.W.3d 291 (Tex. 2006).

- *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000).

- *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656 (Tex. 2005).

- *Vice v. Kasprzak*, 318 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 1979, pet. denied).

- *Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287 (D.C. Cir. 1980).

- *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568 (Tex. 1998).

- *Zacchini v. Scripps-Howard Broadcasting, Inc.*, 351 N.E.2d 454 (Ohio 1976).

- *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066 (5th Cir. 1987).

## Cited Dictionary Pages

- *Merriam-Webster's Collegiate Dictionary* 284 (11th ed.) (s.v. *could*).

- *Merriam-Webster's Collegiate Dictionary* 1445 (11th ed.) (s.v. *would*).

## Cited Rules

- Tex. R. Civ. P. 166a(c).

- Tex. R. Civ. P. 166a(i).

## Record Cites

- 2CR2330–2344 (Carter's employment contracts in full).

- 2CR2332, lines 4–8 (Carter's original employment contract, showing first form of performance-bonus provision).

- 2CR2337 (Carter's original employment contract, Attachment A).

- 2CR2338 (Carter's original employment contract, Attachment B).

- 2CR2341 ([2005] Amendment to [Carter's] Employment Contract).

- 2CR2343 ([February 2007] Amendment Number 2 to [Carter's] Employment Contract).

- 2CR2345–53 (Chamber of Commerce publications).

- 2CR2445–69 (Carter depo. excerpts).

- 2CR2460 (cover of *Hola!* from the Caller-Times).

- 2CR2461 (complete Aguilar affidavit citing Whitmore as source for claim that Carter's bonus was tied to Chamber's financial performance; showing no attempt to contact primary sources; listened to audiotape of 15 Feb. 2008 meeting).

- 2CR2468 (Birmingham's 15 Feb. 2008 "rumor" e-mail: "funny stuff going on with their finances").

- 2CR2469 (Pederson's expert-opin. excerpt: citing Bentley, Whitmore, and Hawley depos. as sources).

- 2CR2464 (Pederson's expert-opin. excerpt: "There is no indication in the record of any connection between the newspaper's coverage of the plaintiff in his role as CEO of the Chamber of Commerce and his earlier role as a critic of Crosstown Commons, a proposed commercial development in the city.").

- 2CR2465 (Pederson's expert-opin. excerpt: the newspaper's March 2 editorial "suggest[ed] that the chamber get rid of [Carter] and move on.").

- 2CR2477 (Plaintiff's Amended Consolidated Summary Judgment Response: "don't ever mess with the man that buys ink by the 50-gallon drum").

- 2CR2485, lines 3–11 & 19–20 (Aguilar depo. excerpt: acknowledging reporter never spoke to Chamber treasurer Damon Bentley or Chamber CPA Darrell Thompson).

- 2CR2486, lines 4–24 (Aguilar depo. excerpt: admitting failure to confirm information).

- 2CR2490 (Birmingham's Caller-Times resignation letter).

- 2CR2491 (Birmingham 15 Feb. 2008 e-mail: "some wanted to fire Terry").

- 2CR2493, lines 15–17 (Bentley depo. excerpt: not mentioning qualifications in finance or accounting).

- 2CR2494, lines 9, 13–16 (Bentley depo. excerpt: not mentioning qualifications in finance or accounting).

- 2CR2495 (Bentley depo. excerpt: involvement with Mauricio Celis).

- 2CR2498, lines 15–20 & 22–25 (Bentley depo. excerpt: became Chamber treasurer; no knowledge of Chamber's accounting method or procedures).

- 2CR2499, line 1 (Bentley depo. excerpt: no knowledge of Chamber's accounting method or procedures).

- 2CR2501, lines 8–25 (Bentley depo. excerpt: accountant commented only generally, needed more information).

- 2CR2502, lines 1–4 (Bentley depo. excerpt: CPA refused to express opinion).

- 2CR2503 (Bentley depo. excerpt: describing Carter's employment contract in part without referring to amendments).

- 2CR2504 (Bentley depo. excerpt: recounting events of scandal).

- 2CR2505 (Bentley depo. excerpt: recounting events of scandal).

- 2CR2506 (Bentley depo. excerpt: recounting events of scandal).

- 2CR2515, lines 12–25 (Hawley depo. excerpt: waffling on financial-performance link to Carter's bonus).

- 2CR2521, lines 3–5 & 23 (Whitmore depo. excerpt: admission she never reviewed entire contract).

- 2CR2522, lines 5–8 (Whitmore depo. excerpt: admission she never reviewed entire contract).

- 2CR2524 (Bentley e-mail inaccurately describing Carter's employment contract).

- 2CR2527 (Reta affidavit excerpt: stating she heard Carter shouting in a meeting).

- 2CR2530 (Caller-Times e-mail: "We need to make it clear that the bylaws we saw were from 2006.").

- 2CR2531 (Tom Whitehurst e-mail altering Whitmore's status as chair).

- 2CR2532 (Birmingham e-mail: Huseman hired by Carter).

- 2CR2533 (some quotations from this e-mail are attributed to Huseman in Appendix Q).

- 2CR2534–35 (CPA's letter to Chamber on audit results and report).

- 2CR2536 (Caller-Times e-mail headings: "Terry Carter Watch for Resignation").

- 2CR2536 (part of 15 Feb. 2008 e-mail from Whitmore to Israel Saenz: Whitmore expressing in vague terms that she was concerned about the Chamber's finances).

- 2CR2538 (Birmingham's angry e-mail).

- 2CR2539 (reader's comment on Damon Bentley's veracity).

- 2CR2540 (Hawley depo. excerpt: showing lack of knowledge about terms of Carter's employment contract; admitting lack of knowledge about Chamber's building fund).

- 2CR2541, lines 3–5 (Whitmore depo. excerpt: showing lack of knowledge about terms of Carter's employment contract).

- 2CR2544, lines 5–7 (Whitmore depo. excerpt: showing lack of knowledge about terms of Carter's employment contract).

- 2CR2474, lines 5–7 & 20–22 (Whitmore depo. excerpt: admitting lack of knowledge about Chamber's building fund).

- 2CR2575 (complete Part 1 of transcript of audiotape from 15 Feb. 2008 meeting: first 82 pages).

- 2CR2576 (portion of Part 1 of transcript of audiotape from 15 Feb. 2008 meeting used for 31 May 2008 article).

- 2CR2578, lines 12–16 (excerpt from Part 1 of transcript of audiotape from 15 Feb. 2008 meeting: CPA was present).

- 2CR2580 (excerpt from transcript of audiotape from 15 Feb. 2008 meeting: Whitmore and Hawley saying Huseman should leave meeting).

- 2CR2611 (excerpt from Part 1 of transcript of audiotape from 15 Feb. 2008 meeting: Bentley saying he thought the bylaws did not apply to the accounting matter then shown otherwise; Whitmore saying she did not think an accountant's opinion was necessary).

- 2CR2642 (complete Part 2 of transcript for audiotape of 15 Feb. 2008 meeting).

- 2CR2663 (Bentley e-mail: failing to mention second amendment to Carter's employment contract).

- 2CR2664 (e-mail to Birmingham reproducing article from another paper: "Bentley seems to have a special pass from the Caller-Times").

- 2CR2667 (e-mail informing Birmingham of "Chamber strategy meeting").

- 2CR2668 (e-mail asking Birmingham to write editorial).

- 2CR2669 (Birmingham's e-mail refusal to speak with journalist who defended Carter).

- 2CR2670 (e-mail thanking Birmingham for "heads up" about Carter's impending resignation).

- 2CR2671 (undated, unattributed article about Carter in previous hometown).

- 2CR2672 (e-mails from editor Shane Fitzgerald about readers' online comments).

- 2CR2673 (article: Michael Grey, "Spat over a renovated mansion turns ugly," *Wall St. J. Online*, [undated]).

- 2CR2674 (21 Feb. 2008 e-mail from Aguilar, identifying "source" as "Sylvia").

- 2CR2675 (Feb. 2008 e-mail from Aguilar, referring to "reliable source").

- 2CR2676 (e-mails related to incorrect information provided by Whitmore).

- 2CR2673 (Birmingham e-mail: Carter had "issues" at previous job).

- 2CR2680 (reader's comment asking "is Bentley an auditor? I'm confused.").

- 2CR2684; 4CR5401 (Carter's first affidavit).

- 2CR2687 (Amended Affidavit of Damon Bentley identifying attached transcript [1 Supp. 2 C.R. 66–75] as part of taped Feb. 15 2008 meeting).

- 2CR2688 (Bentley's amended-affidavit excerpt: acknowledging he saw all provisions and *both amendments*).

- 2CRE2695 (Bentley amended-affidavit attachment: complete copy of Carter's employment contractd).

- 2CR2710 (Bentley amended-affidavit attachment: remaining 9 pages of transcript for audiotape of 15 Feb. 2008 meeting; transcript of Bentley's talk with Chamber accountant).

- 2CR2711, lines 8–23 (Part 2 transcript excerpt: CPA's statement).

- 2CR2721 (Bentley e-mail: showing Bentley knew that Carter did not have the audiotape).

## Introduction

No genuine constitutional question exists in this case. It is not about freedom of speech or press. It's about defaming a private person who did no wrong but angered powerful people. Newspapers are protected by the Constitution and Texas law when they make honest and factual reports of judicial proceedings and public meetings. But the First Amendment and Texas law give no protection to news reports of meetings that are not open to the public, if those reports are made with knowledge that statements are false or with reckless disregard for the truth.

This is not the first time these parties have come to this Court after the trial court denied the appellants' motion for summary judgment. In the previous appeal, the appellants argued that Terry Carter was a public figure who would have to prove actual malice to prevail on his defamation claim. After Carter proved that he was not a public figure, he presented ample evidence that the statements were defamatory and ample evidence of actual malice. This Court rejected the appellants' appeal. The Texas Supreme Court denied their petition.

Back in the trial court 8 years after this suit was filed, the parties were within days of going to trial when the appellants again sought summary judgment on grounds that they could have raised before: that there was no evidence of malice or negligence, that the defamatory statements were true or merely opinion, and that a statutory privilege protects them from prosecution. Carter has previously shown this Court that a jury could find the publications conveyed false impressions and were published maliciously or negligently or both. We regret that this evidence must be presented again and urge the Court to rule with dispatch so that trial may begin.

## Statement of Facts

In September 2004, Terry Carter was hired as CEO and president of the Corpus Christi Chamber of Commerce.[3] He had a distinguished record of military service and exemplary chamber-of-commerce leadership.[4]

Patrick Birmingham was publisher and president of Caller Times.[5] He sat on the editorial board, which debates Caller-Times editorials.[6] He was a board member of the Chamber of Commerce, and the Caller-Times was a member.[7]

Before 2007, Carter's contract provided for a performance bonus based on the Chamber's financial performance.[8] But in February 2007, the contract's terms were changed and the bonus was no longer based on financial performance: it was amended to give him a "performance" bonus with no specified financial or other goals.[9]

The problems underlying this case began in 2007 when investors proposed a multimillion-dollar mall, Crosstown Commons, conditioned upon the City of Corpus Christi's offering tax-increment financing.[10] The City Council

---

3 Appendix 3A (article, 24 June 2004).
4 *Id.*
5 1CR634 (Birmingham aff.).
6 3CR3847 (Birmingham aff.).
7 1CR634 (Birmingham aff.).
8 2CR2332 (¶ IVC). *See also* Carter Dep. 1CR953.
9 2CR2344. *See also* Carter Dep. 1CR894.
10 Appendix 3F (article, 23 June 2007).

had only four days' notice of the proposal before a vote would be held.[11] Birmingham favored the proposal.[12] Carter urged the Council not to act hastily and to take time in reviewing the proposal so the public could be informed.[13] Birmingham quickly concluded that Carter's position was based on "favoritism" and cited that belief when, on December 18, 2007, he noisily withdrew his newspaper from the Chamber of Commerce and resigned from the board, announcing that Terry Carter "is a divisive influence in the community who shows favoritism toward some businesses at the expense of others."[14] He added: "The only way to show he [Carter] doesn't speak for the Caller-Times is to not be a member of the organization."[15] Carter shrugged off the Caller-Times' withdrawal: "I don't think the withdrawal of one member has an effect on other members withdrawing. . . . I don't think we're going to miss a beat."[16]

Sometime after the withdrawal, Birmingham held a private meeting in his office with Whitmore, Hawley, and several others to discuss "concerns."[17]

---

11    *Id. See also* Appendix 5 (newsletter, 22 June 2007); 2CR2455, lines 1–2 (Carter depo.); Appendix 5 (newsletter, 22 June 2007); Appendix 3F (article, 23 June 2007) (Carter's alarm at four days' notice).

12    1CR643.

13    Appendix 3C (article, 13 June 2007); Appendix 3F (article, 23 June 2007). *See also* 2CR2454, lines 24–25; 2CR2455, lines 1–10 (Carter depo.).

14    Appendix 3J (article, 19 Dec. 2007).

15    *Id.*

16    *Id.*

17    4CR6520. *See also* 5CR7971, lines 10–22 (Whitmore depo.).

Birmingham's animosity toward Carter did not subside. On February 10, 2008, the Caller-Times' Sunday *Hola!* newspaper supplement ran a front-page photo of Terry Carter and his wife dancing, beside the heading "Regents Kick Up Heels to Ol' Blue Eyes."[18] At 8:08 that morning, Patrick Birmingham sent an angry e-mail to vice-president Libby Averyt and editor Shane Fitzgerald, suggesting that the photo's purpose was "to piss me off"[19] and that Averyt and Fitzgerald were "not paying attention to what goes in the paper."[20]

On February 15, Birmingham sent an e-mail to Jaime Powell and Libby Averyt saying that he'd heard that "funny stuff has been going on with the Chamber of Commerce finances."[21] That same day, the Caller-Times published the first of 25 articles alleging various improprieties by Carter.[22]

The Chamber of Commerce's executive committee also met in the morning of February 15. Before the meeting, Freddie Martinez, the Chamber's chairman, raised doubts about whether two members of the committee, Sylvia Whitmore and Judy Hawley, were still members under the Chamber's bylaws

---

18    2CR2460.
19    2CR2538.
20    *Id.*
21    2CR2468.
22    Appendix 3K (article, 15 Feb. 2008).

and sought legal advice.[23] The lawyer, Van Huseman, determined that they were not eligible to be committee members under the bylaws.[24]

As CEO, it fell to Carter to inform Whitmore and Hawley of the facts at the beginning of the executive-committee meeting. They refused to believe him and would continue to act as members of the executive committee for months to come. After a few heated exchanges during which no one yelled at anyone,[25] Carter left the meeting.[26]

The purpose of the executive-committee meeting was to discuss concerns about the Chamber's finances. Chamber Treasurer Damon Bentley had no qualifications in finance or accounting[27] and claimed he did not know what accounting method or procedures the Chamber used,[28] even though the Chamber's Accounting Policies and Procedures Manual states the modified accrual method is used.[29] He did not tell anyone about his ignorance before making his report and falsely claiming: "It is undeniable the financials for 2007 as presented to the executive committee and board are inaccurate, inconsistent

---

23    2CR2533 (some quotations from this e-mail are attributed to Huseman in the editorial: *see* Tom Whitehurst e-mail).

24    2CR2533.

25    2CR2575–83 (transcript of tape does not mention any shouting).

26    2CR2583, lines 24–25 ("Terry's left.").

27    2CR2578, lines 12, 15–16 (stating, "I'm not a CPA. . . . That's why I asked a CPA to be here."); 2CR2493, lines 15–17; 2CR2494, lines 9, 13–16 (Bentley depo. excerpt: not mentioning qualifications in finance or accounting).

28    2CR2498, lines 15–25; 2CR2499, line 1 (Bentley depo. excerpt: no knowledge of Chamber's accounting method or procedures).

29    4CR5252.

with the process used in previous years and a misrepresentation of the Chamber's bottom line."[30] Bentley never identified the method by which he altered the financial statements. At the executive-committee meeting, he stated that he believed there were financial irregularities with the Chamber's books and financial reports,[31] even though he did not know what accounting method to use[32] or what method had been used or should be used.[33] He also spoke at length with an accountant, who did not confirm his statements.[34] At the end of the meeting, Freddie Martinez took the audiotape of the meeting and gave it to Carter.[35] Carter then gave the tape to Van Huseman, a lawyer, who kept it until ordered to deliver it to a court in March.[36]

The next day, February 16, and for several days after, internal Caller-Times e-mails carried the title, "Terry Carter Watch for Resignation."[37] The barrage of articles ran from mid-February to mid-June as follows (please read the titles):

- Jaime Powell, "Financial, management questions raised at CC

---

30    1CR302–03.
31    2CR2565–2617.
32    2CR2498, lines 15–25; 2CR2499, line 1.
33    2CR2589, lines 17–23; 2CR2590, line 1; 2CR2591, lines 14–24 (evidencing Bentley's lack of knowledge and understanding of accounting methods).
34    2CR2463–61.
35    1CR659 (citing Depo. of Terry Carter, 24 Sept. 2008, p. 118).
36    Carter Dep. 1CR896; 2CR1518, Appendix 3V (article, 20 Mar. 2008) (mentioning that Huseman had the tape since 15 Feb. 2008); 2CR1551, Appendix 3JJ (article, 31 May 2008) (*id.*).
37    2CR2536–37 (internal e-mail headings in exchanges between Mike Baird, Beth Francesco, Tom Whitehurst, Israel Saenz, and Elvia Aguilar).

Chamber," *Corpus Christi Caller-Times*, February 15, 2008.[38]

- Powell, "Chamber pulls two off panel," *Corpus Christi Caller-Times*, February 16, 2008, at A1, 7.[39]

- Elvia Aguilar, "CC Chamber meeting to discuss financial irregularities," *Corpus Christi Caller-Times*, February 20, 2008.[40]

- Aguilar, "Financial questions lead to call for audit," *Corpus Christi Caller-Times*, February 21, 2008, at A1, 7.[41]

- Aguilar, "Chamber CEO shifted funds, letter says," *Corpus Christi Caller-Times*, February 27, 2008, at A1, 7.[42]

- Aguilar, "Ex-chair airs her Chamber concerns," *Corpus Christi Caller-Times*, February 29, 2008, at A1, 7.[43]

- Editorial, "Chamber CEO's actions raise serious questions," *Corpus Christi Caller-Times*, March 2, 2008, at A20.[44]

- Aguilar, "Petition seeks Chamber changes," *Corpus Christi Caller-Times*, March 3, 2008, at A1, 5.[45]

- Aguilar, "About 80 sign petition on Chamber operation," *Corpus Christi Caller-Times*, March 4, 2008, at A1, 7.[46]

- Aguilar, "Chamber board, CEO to enter talks," *Corpus Christi Caller-Times*, March 8, 2008, at A1, 7.[47]

- Aguilar, "Chamber treasurer granted temporary restraining order

---

[38]  Appendix 3K.
[39]  Appendix 3L.
[40]  Appendix 3M.
[41]  Appendix 3N.
[42]  Appendix 3O.
[43]  Appendix 3P.
[44]  Appendix 3Q.
[45]  Appendix 3R.
[46]  Appendix 3S.
[47]  Appendix 3T.

protecting tape," *Corpus Christi Caller-Times*, March 19, 2008.[48]

- Aguilar, "Chamber unrest ends up in court," *Corpus Christi Caller-Times*, March 20, 2008, at A1, 6.[49]

- Aguilar, "Chamber CEO on paid leave," *Corpus Christi Caller-Times*, March 27, 2008, at A1, 6.[50]

- Aguilar, "Judge unifies filings on Chamber events," *Corpus Christi Caller-Times*, March 27, 2008, at A6.[51]

- Aguilar & Fanny S. Chirinos, "Chamber had deficit, board tells members," *Corpus Christi Caller-Times*, April 1, 2008.[52]

- Aguilar, "Chamber, in need of audit, renews accountant search," *Corpus Christi Caller-Times*, April 29, 2008, at D1.[53]

- Aguilar, "Chamber offers contract settlement to Carter, his attorney says," *Corpus Christi Caller-Times*, May 2, 2008.[54]

- Aguilar, "Chamber makes offer, Carter's attorney says," *Corpus Christi Caller-Times*, May 3, 2008, at D1.[55]

- Chirinos, "Chamber, Carter's attorney confirm severance agreement," by *Corpus Christi Caller-Times*, May 23, 2008.[56]

- Chirinos, "Carter's salary to be paid in full," *Corpus Christi Caller-Times*, May 24, 2008, at A1, 11.[57]

- Chirinos, "Release of chamber audio recording sought," *Corpus Christi*

---

48    Appendix 3U.
49    Appendix 3V.
50    Appendix 3X, 3Y.
51    Appendix 3Z.
52    Appendix 3BB.
53    Appendix 3CC.
54    Appendix 3DD.
55    Appendix 3EE.
56    Appendix 3FF.
57    Appendix 3GG.

*Caller-Times*, May 28, 2008, at B2.[58]

- Mary Ann Cavazos , "Judge orders that chamber tape recording be released today," *Corpus Christi Caller-Times*, May 30, 2008.[59]

- Cavazos, "Chamber tape tells of heated exchange," *Corpus Christi Caller-Times*, May 31, 2008, at A1, 5.[60]

- Cavazos, "Ex-Chamber CEO's mediation to continue," *Corpus Christi Caller-Times*, June 13, 2008, at D1.[61]

Only two weeks after the initial article, the Caller-Times began pressing for Carter's removal.[62] The newspaper's March 2 editorial "suggest[ed] that the chamber get rid of [Carter] and move on."[63] The Caller-Times repeatedly alleged instances of financial malfeasance[64]—insinuating felonies[65]—until the Chamber forced Carter to resign.[66]

In November 2008, a full audit of the Chamber's finances was completed by an outside accounting firm.[67] All of the accusations against Carter were

---

58    Appendix 3HH.
59    Appendix 3II.
60    Appendix 3JJ.
61    Appendix 3KK.
62    Appendix 3P (article, 29 Feb. 2008).
63    Appendix 3Q.
64    *See, e.g.*, Appendix 3M (article, 20 Feb. 2008); Appendix 3N (article, 21 Feb. 2008); Appendix 3O (article, 27 Feb. 2008); Appendix 3P (article, 29 Feb. 2008); Appendix 3Q (editorial, 2 Mar. 2008); Appendix 3R (article, 3 Mar. 2008); Appendix 3S (article, 4 Mar. 2008); Appendix 3T (article, 8 Mar. 2008).
65    Tex. Penal Code §§ 31.03, 32.32, 32.45.
66    Appendix 3Y (article, 27 Mar. 2008); Appendix 3FF (article, 23 May 2008).
67    4CR5433–37.

proved baseless.[68] Although the auditor comments that "[t]he misstatements detected as a result of audit procedures and corrected by management were material, either individually or in the aggregate, to the financial statements as a whole,"[69] the auditor never identifies the nature of the misstatements, who made them, how material they were, or describes any effects on the bottom-lines of the financial statements. Transfers (not "expenditures")[70] from the building fund were "a breach of the intended purpose of the funds" but the auditor did not state what effect, if any, this had on anything.[71] Similarly, the auditor's statement that there was a "very high possibility of management override" was made in the context of identified weaknesses in the system's structure but does not indicate that there was any abuse of that weakness or any others by anyone at any time.[72] The audit did not reveal any wrongdoing by anyone or that the financial statements were in any way incorrect. The auditor did not conclude that generally accepted accounting principles had been violated. The Caller-Times never reported these facts.

After the audit, the Chamber's leadership concluded that its 2007 financial statements had been "fairly presented in conformity with U.S. generally accepted

---

68  2CR2534 (CPA's letter to Chamber on audit results); 2CR2535 (independent auditor's report).
69  ANTBrp30; 4CR5436.
70  ANTBrp30.
71  4CR5431.
72  ANTBrp30; 4CR5446.

accounting principles."[73] Four days later, Joaquin Sanchez, the Chamber of Commerce's CPA, certified that as of December 31, 2007, the Chamber's financial statements "present fairly, in all material respects, the financial position of the [Chamber] . . . and the changes in its net assets and cash flows for the year ended in conformity with accounting principles generally accepted in the United States of America."[74] The Caller-Times never reported these facts.

When Terry Carter filed suit against the Caller-Times, Birmingham, and the other appellants (collectively the "Caller-Times") for defamation and related claims, the Caller-Times stalled going to trial with motions for summary judgment, which were denied, followed by unsuccessful appeals to this Court and the Texas Supreme Court.

---

[73]  2CR2534 (CPA's letter to Chamber on audit results).
[74]  2CR2534 (independent auditor's report).

**Summary of Argument**

Over four months, the Caller-Times published 25 articles containing misleading and false statements about Terry Carter and his performance as CEO of the Corpus Christi Chamber of Commerce. Though the Caller-Times tries to show otherwise, it improperly cherry-picks specific statements in disregard of the established legal standard requiring an entire publication—or series of publications—to be reviewed for defamatory effect. It dismisses the blatantly false statements by conclusively stating that they are "substantially true" or "opinions." It attempts to hide behind a statutory shield of privilege that cannot cover it because the shield is limited to public meetings and not closed meetings of a private organization. And it asserts that there is no evidence of actual malice or negligence without addressing the ample quantities of evidence Carter has adduced time and again.

The Caller-Times has been playing a game of keep-away with the courts, using baseless motions for summary judgment followed by years of fruitless appeals in an effort to avoid letting a jury evaluate the evidence. This Court should stop the game.

## Standard of Review

The Court reviews de novo a trial court's grant of summary judgment[75] and reviews the entire record.[76] As the party moving for summary judgment, the Caller-Times bears the burden of proof.[77] The Caller-Times moved for both traditional and no-evidence motions, but the ultimate question is whether a fact issue exists.[78] A fact issue exists if there is more than a scintilla of probative evidence.[79] This Court should review the summary-judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion"[80] and "consider all grounds presented to the trial court and preserved on appeal in the interest of judicial economy."[81] Constitutional concerns over defamation do not affect the summary-judgment standard of review.[82]

The gist or "meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."[83] A "reasonable person" is

---

75     *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).
76     *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).
77     *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex. 1982).
78     *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012).
79     *See id.* at 527; Tex. R. Civ. P. 166a(c), (i).
80     *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).
81     *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005).
82     *Casso v. Brand*, 776 S.W.2d 551, 555 n.3 (Tex. 1989).
83     *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

a person of ordinary intelligence,[84] an average reader rather than one trained to subject a publication to a critical legal analysis.[85]

Throughout its brief, the Caller-Times asks this Court to review the evidence in selected bits and pieces rather than as a whole and consider whether those fragments are defamatory. It asks the Court to review fragments of articles, not even whole articles, let alone all the articles collectively. But this is not the standard for review established by the Texas Supreme Court. All statements that collectively have a defamatory meaning should be considered together under all the circumstances.[86]

Initially, the Court must determine whether a defamatory meaning could be perceived in an entire publication,[87] which "should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it"[88] because "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception

---

84    *Musser v. Smith Protective Servs.*, 723 S.W.2d 653, 655 (Tex. 1987).

85    *See Kapellas v. Kofman*, 459 P.2d 912, 920 (Cal. 1969) (en banc) (publication should be viewed "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader" (citations omitted)).

86    *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002).

87    *Musser*, 723 S.W.2d at 655.

88    *Turner*, 38 S.W.3d at 114 (citing *Musser*, 723 S.W.2d at 655); *Guisti v. Galveston Tribune*, 150 S.W. 874, 878 (Tex. 1912); *see also Kapellas*, 459 P.2d at 920 (publication should be viewed "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader" (citations omitted)).

of the entirety of a publication and not merely on individual statements."[89] When the publication is ambiguous or cannot be understood without the use of extrinsic evidence, the Court should then consider innuendo.[90]

To defeat the motion for summary judgment and show more than a scintilla of actual malice or negligence, Carter need show only that a reasonable person would have drawn a false perception of Carter from the publications.

## Argument

### A. Substantial evidence shows that the articles are collectively defamatory and defamatory per se.

To distinguish between an actionable statement of fact and a constitutionally protected expression of opinion, the analysis focuses on the statement's verifiability and the entire context in which it was made.[91] A jury could reasonably find that the gist of the Caller-Times' 25 articles is that Carter, a fiduciary to a nonprofit, was committing financial malfeasance and crimes to justify a raise, bonus, and contract extension for himself—and that when caught, he blocked the truth with actions such as yelling, dismissing board members to stymie further inquiries and investigation, concealing the audiotape of a critical

---

89 *Turner*, 38 S.W.3d at 115.
90 *Vice v. Kasprzak*, 318 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 1979, pet. denied) (citing *Turner*, 38 S.W.3d at 114; *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.—Waco, 2005, no pet.).
91 *Vice*, 318 S.W.3d at 17.

meeting, and denying the Chamber of Commerce's treasurer access to documents and barring him from speaking to an accountant for fear that the treasurer's accusations would be proved. All these elements of the gist are false. The Caller-Times' articles published on February 15, 16, 20, 27, and 29 amount to much more than a scintilla of evidence of this intended gist. Its March 2 editorial reinforces this, as do the remaining articles that injured Carter in his office, profession, and occupation.[92]

Taken together, the articles accuse Carter of theft and misapplication of fiduciary property.[93] They convey the definite idea that Carter was acting on a corrupt motive to get unearned compensation.

This Court should conclude that ample evidence shows the entirety of these articles to be capable of a defamatory meaning. Alternatively, this Court should hold as a matter of law that the articles were capable of defamatory meaning and that a material fact question about their meaning remains.

1. **Ample evidence shows that the Caller-Times' articles were not substantially true.**

Under the doctrine of "substantial truth," if a news article has the same effect on the mind of the average reader as a true statement, slight inaccuracies

---

92    *Bunton*, 94 S.W.3d at 579.
93    Tex. Penal Code §§ 31.03(f)(3)(B), 32.45(b).

in the details won't make the article false.[94] Although the Texas Supreme Court

has not addressed a case in which publications may be mere allegation reporting,

it has suggested that the measure for the truth of the publication "could be

whether it accurately relayed the allegations of a third party."[95] Also, even if "the

specific statements in a broadcast may be substantially true when viewed in

isolation, the gist can be false by omitting or juxtaposing facts."[96] The entire

article—or series—should be examined to determine whether the gist is

substantially true.

The Caller-Times has the burden to conclusively prove that the gist of its

statements in all the publications were true.[97] If a fact issue exists, a jury must

decide.[98] The statements in the March 2 editorial are not entitled to automatic

constitutional protection as opinions. A newspaper is liable for an editorial

writer's defamatory statements. As the Fifth Circuit explained:

> A servant under a duty to gather information on the wrongful
> conduct of another person subjects his corporation to liability for
> malicious statements made in connection with his employment
> and with a purpose to serve it. An act may be done within the
> scope of employment although done in part to serve the purpose
> of the servant.[99]

---

94    *See Masson v. New Yorker Mag.*, 501 U.S. 496, 516–17 (1991); *Turner*, 38 S.W.3d at 115.
95    *Neely v. Wilson*, 418 S.W.3d 52, 65 (Tex. 2013).
96    *Id.* (citing *Turner*, 38 S.W.3d at 114–15).
97    *Turner*, 38 S.W.3d at 115.
98    *Neely*, 418 S.W.3d at 62.
99    *Hooper-Holmes Bureau v. Bunn*, 161 F.2d 102, 104–05 (5th Cir. 1947) (citing Restatement (First) of Agency § 247 cmt. c & illustrations (1933)).

The Caller-Times points to only 2 of the 25 articles it published and argues that they provide an accurate account of allegations advanced by Bentley and others to the Chamber's board. But it says nothing about the accuracy of the other 23 publications, including an editorial. And because this Court should consider whether the gist of the 25 publications—collectively—was substantively true, the Caller-Times has not met its burden of proof. When all 25 articles are reviewed, a material fact question remains.

For example, the writer of the unsigned March 2, 2008 editorial did not use any qualifiers or otherwise suggest that anything stated was only an allegation or at least not a proven fact. The editorial implies that Carter committed at least three felonies: (1) theft;[100] (2) false statement to obtain property or credit;[101] and (3) misapplication of fiduciary property.[102]

The editorial's headline, "Chamber CEO's actions raise serious questions," was immediately followed by the subheadline "Funds were shifted that made a loss look like a profit, entitling CEO to a bonus."[103] Read together, these insinuate that Carter deliberately and wrongfully shifted funds to corruptly gain a bonus from the Chamber. The Caller-Times openly accuses Carter: "The fund-shifting, including the deferring of Carter's salary, allowed the chamber to

---

100    Tex. Penal Code §§ 31.03, 32.32, 34.45.
101    Tex. Penal Code § 32.32.
102    Tex. Penal Code § 32.45.
103    2CR1507, Appendix 3Q (editorial, 2 Mar. 2008).

show a profit, thus qualifying Carter for a bonus."[104] This suggests that Carter

violated his fiduciary duties and misapplied the Chamber's funds to wrongfully

gain a bonus.[105]

The truth is that Carter's eligibility for a bonus at the end of 2007 was not

based on whether the Chamber showed a profit.[106] In January 2007, the

Chamber's executive committee reviewed Carter's contract and amended the

bonus provision.[107] As a member of the board of directors at the time, the

Caller-Times' publisher, Birmingham, knew or should have known this fact.

The Caller-Times argues that it reported Carter's explanation and is therefore

protected under the substantial-truth defense. But Carter's explanation was

followed by a misleading and false statement:

> Carter's explanation, made in a letter to board members, is that
> the fund-shifting was allowed by the chamber's accounting
> methods, that the deferral of salary was for tax purposes with the
> failure to show deferral properly on the books explained as a
> bookkeeping error. The use of capital money from the chamber's
> foundation for operating expenses, Carter said, had been
> discussed with the chamber's accountant. *But that accountant,*
> *Darrell Thompson, Bentley wrote, warned that the use of foundation money*
> *in such a way would threaten the chamber's nonprofit status.*[108]

---

104   *Id.*
105   Tex. Penal Code § 32.45.
106   2CR2695–27 *et seq.* (Carter's contracts).
107   *Id.*
108   2CR1507, Appendix 3Q (editorial, 2 Mar. 2008) (presenting "opinions" as facts)
      (emphasis added).

The last sentence in this passage implies that if one of Carter's actions was wrongful, then *all* of Carter's actions were wrongful. It further implies that Carter's explanation was a lie to cover up efforts to illegally obtain a bonus.[109] This is misleading and false, and the Caller-Times knew it was false. It had a copy of the letter Damon Bentley sent to the Chamber's members.[110] In that letter, Bentley wrote that Darrell Thompson, the Chamber's accountant said:

> [U]se of Building Fund dollars to supplement the Chamber operating expenses *could possibly* forfeit the [Chamber] foundation's [nonprofit] status because of the link between the CEO's bonus to the financial performance of the Chamber.[111]

The Caller-Times' use of *would* (as opposed to *could possibly*) connotes probability,[112] and to an ordinary reader, the sentence as a whole—*warned that the use of foundation money in such a way would threaten the chamber's nonprofit status*—suggests imminent harm. But the Caller-Times knew that Bentley had described Thompson as saying only *could*, which connotes only possibility,[113] not a dire threat, and certainly not criminality.

Bentley's letter also shows Thompson's opinion was based on incorrect information. There was no link between the CEO's bonus and the Chamber's

---

109   Tex. Penal Code § 32.32.
110   2CR1501, Appendix 3O (article, 27 Feb. 2008).
111   *Id.* (emphasis added).
112   *Merriam-Webster's Collegiate Dictionary* 1445 (11th ed.).
113   *Id.* at 284. *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 248 (2016) ("*Could* is better for a sense of uncertainty.").

financial performance.[114] Yet the op-ed falsely states that because the Chamber

showed a profit, Carter qualified for a bonus.[115] Further, the accountant had

spoken from "a general standpoint"[116] and "was very specific that he needed

more information, and that he would have to review [documents]."[117]

The Caller-Times claimed it did not acquire the letter from Bentley, but

verified that he had sent it to Chamber board members.[118] It did not contact the

accountant to determine the accuracy of this article.[119] If the Caller-Times had

simply asked Thompson—or any other accountant—directly about the effect of

the action on a nonprofit based on the cited information, it would have learned

the truth: the Chamber was not in a grave situation. Thompson had not warned

or even expressed an opinion that the Chamber's nonprofit status was in

jeopardy[120] and never stated Carter had done anything wrong.[121] Instead, the

Caller-Times relied on Bentley, without verifying his qualifications in

accounting.[122] And it never made another effort to contact Thompson.[123]

---

114  2CR2695–2709 (Carter's contracts).
115  *Id. Compare* 2CR1507 ("The fund-shifting, including the deferring of Carter's salary, allowed the chamber to show a profit, thus qualifying Carter for a bonus.").
116  2CR2501, lines 8–25; 2CR2502, lines 1–4 (Bentley depo.).
117  2CR2501, lines 16–18.
118  2CR1501 (article, 27 Feb. 2008).
119  2CR2485, lines 3–11 & 19–20 (Aguilar depo. excerpt: acknowledging reporter never spoke to Chamber treasurer Damon Bentley or Chamber CPA Darrell Thompson)
120  2CR2720, lines 8–23 (transcript of talk with accountant).
121  *See generally* 2CR2710–20 (transcript of talk with accountant).
122  2CR2493, lines 15–17; 2CR2494, lines 9, 13–16 (Bentley depo.).
123  2CR2464 (Aguilar affidavit).

The Caller-Times' other articles parrot these allegations implying that Carter's actions were criminal. The statements were false, and the articles supply plentiful evidence that an ordinary reader would perceive defamatory criminal accusations—only a scintilla being needed.

Even if this Court indulged the Caller-Times and engaged in an article-by-article review, the editorial is plainly not substantially true.

The Caller-Times attempts to distinguish *Neely v. Wilson*[124] from this case. In *Neely*, a television station argued that the gist of a broadcast concerned allegations about a physician's care of two patients that led to malpractice lawsuits, a report by the medical examiner, a public disciplinary action by the Medical board, and the physician's responses to the allegations. But the broadcast expressly stated that the physician had been disciplined for taking drugs.[125] The Texas Supreme Court noted that the Medical Board had disciplined the physician "for prescribing himself dangerous drugs or controlled substances" but not for "*taking or using* dangerous drugs or controlled substances."[126] The physician himself swore in an affidavit that he had never abused any kind of dangerous drugs.[127] The Court also noted that the station was aware that it had no independent evidence to support its statements that the physician had

---

124  418 S.W.3d 52, 65–66 (2013).
125  *Id.* at 65.
126  *Id.* at 66.
127  *Id.*

performed surgery while impaired,[128] indicating the station knew or should have known the statement to be false. The Court held that the physician's affidavit was sufficient to raise a fact issue about the truth or falsity of the gist.[129] The substantial-truth defense failed.[130]

*Neely* shows that merely including a targeted person's responses in a news report is not enough when the facts are inaccurately reported, as they were here. Although it isn't clear whether the television station in *Neely* had a copy of the Medical Board's disciplinary order, there's no doubt the Caller-Times had a copy of the letter referred to in the editorial and knew or should have known it was misstating the contents. Further, Carter responded to and refuted the Caller-Times' allegations in a lengthy affidavit. These factors were sufficient to raise a fact issue in *Neely.* They are sufficient here as well.

The Caller-Times did not conclusively prove the substantial-truth defense; Carter raised a fact issue.[131] This Court should therefore remand for trial.

2. **The publications are not constitutionally protected opinion.**

The Caller-Times' next argument is that all its libels about Carter are protected opinions, not fact statements.[132] It offers no argument to explain how

---

128    *Id.* at 67
129    *Id.*
130    *Id.*
131    *Id.* at 65.
132    ANT BR p. 56.

they are opinions—only conclusory statements that they are opinions. Even if they were opinions (they are not), the First Amendment does not protect all statements of opinion on issues of public concern.[133] For constitutional purposes, the falsity of a publication depends on whether "a statement carries a 'provably false factual connotation.'"[134] In interpreting precedent, the Texas Supreme Court has said: "courts should determine falsity for constitutional purposes based on the meaning a reasonable person would attribute to a publication and not on a technical analysis of each individual statement."[135]

In *Milkovich v. Lorain Journal Co.*,[136] the United States Supreme Court warned against allowing defamatory statements to be craftily "couched":

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"[137]

---

133  *Turner*, 38 S.W.3d at 115 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20 (1990)).

134  *Id.* at 116 (citing *Milkovich*, 497 U.S. at 18). *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 422 (2016) (defining *connotation* as "[t]he feeling or idea that a word carries in addition to its literal or principal meaning").

135  *Turner*, 38 S.W.3d at 116.

136  497 U.S. 1, 16 (1990).

137  *Id.* 19–20.

The Caller-Times claims that its March 2 editorial is protected opinion, but it does not explain how or why.[138] There is no "opinion" defense for a publication conveying a false gist of corrupt or dishonorable motives in connection with an established set of facts.[139] In addition to the statements reproduced above, the editorial's headline, "Chamber CEO's Actions Raise Serious Questions," was immediately followed by the subheadline "Funds were shifted that made a loss look like a profit, entitling CEO to a bonus."[140] Read together, these insinuate that Carter deliberately and wrongfully shifted funds to corruptly gain a bonus from the Chamber. The Caller-Times then openly accused Carter (given that he is identified as head of the Chamber): "The fund-shifting, including the deferring of Carter's salary, allowed the chamber to show a profit, thus qualifying Carter for a bonus."[141] This suggests that Carter violated his fiduciary duties and misapplied the Chamber's funds to wrongfully gain a bonus.[142] But as explained above, the Caller-Times knew there was no connection between a profit (or loss) and Carter's eligibility for a bonus. The editorial also accused him of engaging in "duplicitous dealings" and "highly questionable stewardship of the financial affairs," and causing "severe damage to

---

138   ANTBrp58.
139   *Bunton*, 94 S.W.3d at 582.
140   2CR1507, Appendix 3Q (editorial, 2 Mar. 2008).
141   *Id.*
142   Tex. Penal Code § 32.45.

a very important civic organization." All were stated as facts, not as opinions or even allegations made by others.

These statements provide much more than the required scintilla of evidence. The Caller-Times conveyed the impression that Carter was corrupt, criminal, untrustworthy, and abusive of his fiduciary position for personal gain. Like the other articles, this op-ed omits the critical facts.

The rest of the Caller-Times' publications fare no better because they, too, trumpet the same defamatory gist. The Caller-Times plucks out snippets of its publications and declares without explanation that they were protected opinion. It ignores the proper standard of review: this Court considers all the publications and the surrounding circumstances to determine whether a jury could find a libelous gist.

A jury could reasonably conclude the Caller-Times defamed Carter in all of its articles collectively by creating the innuendo that he was engaging in financial misdeeds, breaching fiduciary duties for personal gain, yelling at respected female leaders, and blocking the investigation into his misdeeds. This gist is provably false. It is not an opinion.

### 3. The judicial-proceeding privilege does not shield the Caller-Times.

Of the Caller-Times' 25 publications, at least 21 do not fall within the judicial-proceeding privilege.

Texas law codifies the judicial-proceeding privilege, which includes judicial or other proceedings to administer the law, executive or legislative proceedings, and "the proceedings of a public meeting dealing with a public purpose."[143] Publications about such proceedings are privileged if they are "a fair, true, and impartial account"[144] and also make " reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern."[145] The privilege applies only to statements that (1) are substantially true and impartial reports of the proceedings, and (2) are identifiable by the ordinary reader as statements that were made in the proceeding.[146]

The privilege does not apply to at least 21 of the publications for two reasons. First, they are not reports on the official acts of a public official.[147] Terry Carter was CEO of a private organization and is not a public figure.[148] Second, as a private organization, the Chamber of Commerce's meetings are not open to the general public and discussion of its financial affairs is not a public purpose.[149]

The Caller-Times conclusively states that its publications of March 19, March 20, May 29, and May 31, 2008, are fair reports of judicial proceedings.[150]

---

143   Tex. Civ. Prac. & Rem. Code § 73.002.
144   Tex. Civ. Prac. & Rem. Code § 73.002(b)(1).
145   Tex. Civ. Prac. & Rem. Code § 73.002(b)(2).
146   *Neely*, 418 S.W.3d at 67 (citing *Denton Pub. Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex. 1970)).
147   Tex. Civ. Prac. & Rem. Code § 73.002(b)(2).
148   *Scripps Texas Newspaper, LP v. Carter*, 13-09-00655-CV, 2012 WL 5948955, at *5 (Tex. App.—Corpus Christi, Nov. 21, 2012, pet. denied).
149   Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(D).
150   ANTBrp58.

It quotes a few sentences from each. The Caller-Times must show that the privilege applies to the publications as a whole. It has not even attempted to do so.

## B. There is evidence aplenty of actual malice, recklessness, and negligence—and all factual inferences are to be drawn in Carter's favor.

Evidence of actual malice is sufficient if it permits concluding that the defendant made the false publication with a "high degree of awareness of . . . probable falsity,"[151] or "with reckless disregard of whether it was false or not."[152] To defeat the motion for summary judgment and show more than a scintilla of actual malice, Carter need only show that a reasonable person would have drawn a false perception of Carter from the publications.[153] Carter may show recklessness and negligence through evidence that the Caller-Times had information from which it knew or should have known defamatory statements were false.[154] Ample evidence also shows the Caller-Times was negligent because it failed to investigate the falsity of the statements it published, and failed to act as a reasonably prudent person.[155] When the publication is ambiguous or its

---

151 *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).
152 *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).
153 *Turner*, 38 S.W.3d at 115.
154 *Neely*, 418 S.W.3d at 72 (citing *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 820 (Tex. 1976)).
155 *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 85 (Tex. App.—Houston [1st Dist.] 2013) (no pet.).

importance is doubtful, a jury must determine its meaning.[156] The primary means

of proving actual malice is by circumstantial evidence.[157]

### 1. The Caller-Times' publisher had motives to attack Carter.

Ill-will, spite, or evil motive, standing alone, do not amount to actual

malice on the part of an entity.[158] But it is a factor. In the right case it may be a

big factor. Here, a jury could decide that personal malice played a role in

explaining why the Caller-Times published so many devastating and false

statements about Carter. When combined with other evidence, the owner and

publisher's ill-will leads to a finding that the Caller-Times knowingly published

false statements with actual malice, entitling Carter to punitive damages.

Although Birmingham denies having any personal animosity toward

Carter, the evidence shows otherwise. A reasonable inference of personal malice

may be drawn from the Caller-Times' article of December 19, 2007—the day

after Birmingham abruptly resigned from the Chamber board and withdrew his

newspaper's Chamber membership.[159] He called Carter "divisive" and accused

him of "favoritism."[160] Carter tried to be positive: "I don't think we're going to

---

156  *Musser*, 723 S.W.2d at 655.
157  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).
158  *Bunton*, 94 S.W.3d at 581 (injurious motive is not proof of actual malice but it is a factor to be considered); *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 639 (Tex. 2005); *see also Harte-Hanks Commc'ns*, 491 U.S. at 668.
159  2CR3011. *See also* 2CR2490 (Birmingham letter to Chamber of Commerce); 2CR1488, Appendix 3J.
160  2CR3011.

miss a beat."[161] Birmingham then responded with what he thinks is "the only

way to show [Carter] he doesn't speak for the Caller-Times."[162] Birmingham

ordered the Chamber to remove the Caller-Times from contact lists[163] and then

became angry when, in obedience to Birmingham's order, Carter stopped

inviting the Caller-Times to high-profile Chamber functions.[164]

Birmingham wrote the first e-mail accusing Carter of financial

misdeeds[165]—and later testified in deposition that he couldn't remember his

source,[166]—immediately after which Caller-Times staff members began

exchanging e-mails with the subject line "Terry Carter Watch for Resignation."[167]

Later articles and editorials directly reflecting Birmingham's personal views offer

more than a scintilla of evidence he could and did influence, control, and

manipulate the Caller-Times' content.[168] Birmingham was also on the

newspaper's editorial board,[169] and in March 2008, he was asked to write a

---

161  *Id.*
162  *Id.*
163  2CR2490.
164  3CR4603–04.
165  3CR4298.
166  3CR4286, lines 24–25, and 3CR4287, lines 1–7 (Birmingham depo.).
167  2CR2537 (internal e-mail headings in exchanges between Mike Baird, Beth Francesco, Tom Whitehurst, Israel Saenz, and Elvia Aguilar).
168  *See also* 2CR2532 ("rumor" e-mail); 2CR2468 (Birmingham 15 Feb. 2008 e-mail: "some wanted to fire Terry"); 2CR2669 (refusing to speak with journalist who defended Carter).
169  3CR3847.

Sunday editorial.[170] He admitted knowing about the contents of the March 2, 2008 editorial.[171] It reflected his opinions.[172]

In his deposition, Birmingham explained all his business and personal reasons for wanting Carter eliminated.[173] These include Carter's reaction to the Caller-Times' unfavorable reports about a Chamber of Commerce member (CITGO),[174] Carter's allegedly "dressing down" Aguilar when she asked a question,[175] Carter's supposed refusal to work out his problems with Birmingham,[176] the Caller-Times' voluntary withdrawal from the Chamber,[177] a television interview where Carter allegedly said hurtful things about Birmingham,[178] and Carter's supposed favoritism.[179] The "dressing down" incident turned out to be Aguilar's asking Carter after a press conference why she hadn't been told something earlier and Carter's reply that he'd been out of town on a family emergency and unable to call her back.[180]

---

170   2CR2668 (e-mail asking Birmingham to write editorial).
171   3CR3847.
172   *See* 3CR3785 (Jiminez aff.) ("The March 2, 2008 editorial reflected the opinions of the editorial board of the Caller-Times regarding the matters discussed in the editorial.").
173   3CR4283; 4CR5879–81; 4CR6519.
174   3CR4283, lines 1–10; 3CR4284, lines 13–16; 4CR6523, lines 2–25.
175   4CR6521–22.
176   3CR4284, lines 13–22.
177   4CR6525, lines 4–22.
178   4CR6556. *See also* 2CR3217–18 ("First Edition" excerpt).
179   4CR6556.
180   4CR6521–22.

The transcripts in the record of television interviews show that Birmingham made disparaging statements about Carter[181] but Carter made none about Birmingham or the Caller-Times.[182]

Although Birmingham denied it, some evidence shows he exercised leadership and control over what the Caller-Times published. He showed open animosity toward Carter to the newspaper's staff. One example is a February 10, 2008 e-mail from Birmingham to Libby Averyt and Shane Fitzgerald. Birmingham was outraged because the Caller-Times had published a picture showing Carter dancing with his wife.[183] Birmingham exploded:

> I have a lot tolerance for things one might describe as mistakes, but after looking at today's Hola front of section I can honestly say that you and Shane are either not paying attention to what goes in the paper or the editorial department has some sort of strange passion to simply piss me off. If it is the latter, mission accomplished![184]

This e-mail is direct evidence of Birmingham's personal animus toward Carter. That Birmingham accused Averyt and Fitzgerald of not paying attention to what goes on in the paper suggests that a plan to eliminate Carter was already in place and they were not following it.

---

181  2CR2317–18 (transcript excerpt of "First Edition" broadcast on 19 Dec. 2007).
182  *Id.*; 2CR3233–36 (transcript excerpt of "First Edition" broadcast on 10 Sept. 2007); 2CR2316–17 (transcript excerpt of "First Edition" broadcast on 19 July 2007); 2CR2326–31 (transcript excerpt of "First Edition" broadcast on 23 June 2007); 2CR2332–34 (transcript excerpt of "First Edition" broadcast on 22 June 2007); 2CR2360–65 (transcript excerpt of "First Edition" broadcast on 11 June 2007).
183  2CR2460 (*Hola!* cover).
184  2CR2538.

Immediately after the Chamber's executive-committee meeting of February 15, 2008, the Caller-Times began a "Terry Carter Watch for Resignation."[185] The record shows that only Damon Bentley, whom the Caller-Times was shielding from scandal,[186] was demanding Carter's dismissal.[187] And on February 16, the Caller-Times began looking into Carter's past because of a rumor that "there were issues at his previous job"[188] years ago. This indicates that the Caller-Times was motivated and preparing to drive Carter to resign.

By late February, the Caller-Times had purportedly dug up dirt about Carter. Birmingham provided the material to Caller-Times editor Shane Fitzgerald.[189] None of the material had anything to do with Carter's job performance before or since joining the Chamber.[190] Its only purpose was to sully Carter's reputation. Although it was never published, it shows that the Caller-Times was motivated to injure Carter by whatever means necessary.

This disquieting evidence of personal malice explains why the Caller-Times published so many defamatory articles. All in all, the record contains far more than a scintilla of evidence that the Caller-Times acted with actual malice: it

---

185    2CR2537 (internal e-mail headings in exchanges between Mike Baird, Beth Francesco, Tom Whitehurst, Israel Saenz, and Elvia Aguilar).

186    See pp. 46–47 of this brief.

187    2CR2632, lines 9–10; 2CR2634, lines 14–15.

188    2CR2679.

189    2CR2673–75 (Michael Grey, "Spat over a renovated mansion turns ugly," *Wall St. J. Online*, [undated]). *See also* 2CR2671 (undated, unattributed article).

190    2CR2673–75; 2CR2671.

presents a triable issue of fact. The jury could decide all these false, designedly

hurtful publications were not a series of good-faith accidents but part of a

pernicious plan.

## 2. The Caller-Times selectively omitted material facts and juxtaposed facts with innuendo.

When a publisher knows or strongly suspects the gist of a writing is

misleading, it is a "calculated falsehood" to publish it.[191] The Texas Supreme

Court has declared the Texas rule for when innuendo crosses over to

defamation:

> Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[192]

Selectively omitting facts or suggestively juxtaposing actual facts against

innuendo to create a false impression is evidence of actual malice.[193] A

publication's meaning depends on how it affects an ordinary person's

perception.[194] Even if individual statements considered in isolation may be

---

191 *Turner*, 38 S.W.3d at 120 (citing *Garrison*, 379 U.S. at 75).
192 *Bunton*, 94 S.W.3d at 591 (citing *Garrison*, 379 U.S. at 75 and quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).
193 *Turner*, 38 S.W.3d at 114; *Franco v. Cronfel*, 311 S.W.3d 600, 607 (Tex. App. 2010) (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 425–26 (Tex. 2000)).
194 *Turner*, 38 S.W.3d at 114.

literally true or nondefamatory, a publication may still convey a false and defamatory impression by omitting or juxtaposing facts.[195] Defamation may be shown when the publication "gets the details right but fails to put them in the proper context"[196] so that as a whole the arrangement of the discrete facts is misleading.[197]

One example of a misleading omission is the article headed "Chamber Tape Tells of Heated Exchange."[198] The recording of the February 15, 2008 meeting was just over one hour long.[199] The article quotes some of the exchanges among those present,[200] making it appear that Carter had been out of control for most of the meeting. But the article fails to mention that those exchanges lasted only a few minutes and Carter left the room almost immediately—not "later."[201] The transcript of the meeting is 91 pages long;[202] the portion excerpted is only 4 pages.[203] During the remainder, among much else, several things happened: Judy Hawley and Sylvia Whitmore demanded that

---

195 *Id.* (citing *Golden Bear Distrib. Sys. v. Chase Revel, Inc.*, 708 F.2d 944, 948–49 (5th Cir. 1983)). *See also Huckabee*, 19 S.W.3d at 425.

196 *Turner*, 38 S.W.3d at 115 (citing W. Page Keeton et al., *Prosser & Keeton on Torts* § 116, at 117 (Supp. 1988)).

197 *Turner*, 38 S.W.3d at 115.

198 2CR1551, Appendix 3JJ (article, 31 May 2008).

199 *Id.*

200 *Id.*

201 *Id.*

202 2CR2575 *et seq.* (first 82 pages of transcript); 2CR2687 (Amended Affidavit of Damon Bentley identifying attached transcript as part of taped 15 Feb. 2008 meeting); 2CR2720 (remaining 9 pages of transcript).

203 2CR2577 *et seq.*

the Chamber's attorney, Van Huseman, leave before Damon Bentley's treasurer's report,[204] Bentley stated he did not think the bylaws applied to the accounting matter (even though he was immediately shown otherwise),[205] Whitmore said she did not think an accountant's opinion was necessary,[206] and Bentley had a long talk with an accountant.[207]

The Caller-Times ignored all of this, saying only that "Bentley could be heard giving his financial report."[208] Despite having the truth in hand, the Caller-Times made no effort to correct its false publications.[209] Aguilar never mentioned that there was in fact no shouting[210] or that Carter never returned to the meeting, which raises the question how he could have "seized" the tape and stormed out, as the Caller-Times had previously reported.[211] Nor did she mention that Bentley had in fact talked at length with the accountant at the meeting,[212] despite previous claims published in the Caller-Times[213] about Carter "denying the treasurer access to critical information and advice of financial

---

204 *Id.*
205 *Id.*
206 *Id.*
207 2CR2710–25 (transcript).
208 2CR1551, Appendix 3JJ (article, 31 May 2008).
209 *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) (failure to correct false statement when truth is uncovered is evidence of actual malice).
210 2CR1487, Appendix 3K (article, 15 Feb. 2008); 2CR1493, Appendix 3L (article, 16 Feb. 2008); 2CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008).
211 2CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008).
212 2CR2634–22 (transcript); 2CR2710–19 (transcript).
213 2CR1503, Appendix 3P (article, 29 Feb. 2008).

professionals employed by the chamber of commerce."[214] If Aguilar failed to listen to the entire tape—despite the many articles written about what supposedly did and didn't happen—then she either deliberately avoided learning the truth[215]—which is also evidence of actual malice[216]—or was negligent.[217]

One allegation of financial malfeasance repeated several times by the Caller-Times was that Carter improperly shifted Chamber funds between accounts.[218] The allegation implies that Carter did so with no one's knowledge—a felony.[219]

This is not true. Patrick Birmingham, president and publisher of the Caller-Times,[220] was a member of the Chamber's board of directors from January 2005 through October 2007.[221] He had actual knowledge of relevant information concerning the financial operations of the Chamber. Carter reported to all Chamber board members about the Chamber's financial status on a monthly basis, and financial statements showed that Carter transferred funds from the building fund to another account in the ordinary course of Chamber

---

214    *Id.*
215    *See Bunton*, 94 S.W.3d at 596; *Harte-Hanks Commc'ns*, 491 U.S. at 692 (reporter avoided listening to tape).
216    *Bunton*, 94 S.W.3d at 596; *see also Harte-Hanks Commc'ns*, 491 U.S. at 692.
217    *Newspaper Holdings*, 416 S.W.3d at 85 (failing to investigate falsity and act as a reasonably prudent person is negligence).
218    *See, e.g.*, 1CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008); 2CR1514, Appendix 3T (article, 8 Mar. 2008).
219    *See* Tex. Penal Code §§ 31.03, 32.32, 32.45.
220    2CR2684 (Carter's first affidavit).
221    *Id.*

business.[222] Board members were required to and did vote to approve, disapprove, or abstain on each monthly financial report.[223] Each voting board member, including Birmingham, Bentley, Hawley, and Whitmore, voted to approve each of the financial reports.[224] As a board member, Birmingham knew this. The Caller-Times and Scripps knew it as well.

By selectively omitting the fact that Chamber board members knew that Carter properly transferred funds between accounts and approved the monthly financial reports, the Caller-Times created a damagingly false impression that Carter secretively engaged in financial improprieties.

Standing alone, or combined with other factors, this is much more than a scintilla of evidence that the Caller-Times acted with actual malice[225] or was at the very least negligent.[226]

### 3. The Caller-Times deliberately avoided the truth.

Although merely failing to fully investigate is not evidence of actual malice, purposefully avoiding the truth is.[227]

---

222 *Id.* at 2684–85.
223 *Id.* at 2685.
224 *Id.*
225 *See Franco*, 311 S.W.3d at 607.
226 *See Newspaper Holdings*, 416 S.W.3d at 85.
227 *Bunton*, 94 S.W.3d at 596; *see also Harte-Hanks Commc'ns*, 491 U.S. at 692.

In *Bentley v. Bunton*,[228] a local judge sued the host of a call-in talk show for defamation after the host repeatedly accused him of being corrupt.[229] Although the host claimed his accusations were based on his own investigations, evidence showed that he had deliberately ignored investigating all the relevant people who could have shown his accusations to be false.[230] The Court noted the absence of any evidence supporting the host's accusations.[231]

The Caller-Times repeatedly and consistently ignored evidence showing it to be wrong about the gist and details of its publications about Carter. It published the March 2, 2008, editorial ignoring facts in its possession and showing an avoidance of truth. It referred to the attempted removals of Chamber executive-board members Hawley and Whitmore as "duplicitous dealings by Carter in his relations with . . . the executive council."[232] It also disparaged the "convenient, for Carter, rereading of the bylaws" as "nothing less than an attempt to intimidate critics of his conduct."[233]

But the evidence shows that the Caller-Times purposely ignored known facts before making those statements: (1) Martinez, not Carter, sought legal

---

228   94 S.W.3d 561 (Tex. 2002).
229   *Id.* at 566–67.
230   *Id.* at 601.
231   *Id.*
232   2CR1506, Appendix 3Q (editorial, 2 Mar. 2008).
233   *Id.*

advice about Hawley's and Whitmore's executive-council membership;[234] (2) Van Huseman, not Carter, determined that they were not members under the bylaws;[235] (3) Whitmore was not immediate past chair,[236] and an editor had tried to improperly change her status;[237] (4) Hawley's eligibility had expired because the Port of Corpus Christi's contract had expired; (5) the Caller-Times had an out-of-date copy of the bylaws[238] and did not inquire what the current bylaws provided, let alone how they could be interpreted. The Caller-Times downplayed or disregarded Huseman's legal opinion, perhaps because he had been hired to represent the Chamber by Carter.[239] This information came from Birmingham, who hated Carter.[240] Birmingham and others even ignored calls and a pointed article from a rival publisher explaining the "lynch mob" attack on Carter and correcting many details.[241]

Similarly, in *Harte-Hanks Communications v. Connaughton*,[242] a newspaper made a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of allegations it made about a judicial candidate.[243] By failing

---

234  2CR2533 (some quotations from this e-mail are attributed to Huseman in the editorial: *see* Tom Whitehurst e-mail, 2CR2531).

235  2CR2533.

236  2CR2531 (Tom Whitehurst e-mail).

237  *Id.* ("it's because she's now the immediate past chairman with Doug Allen leaving").

238  2CR2530 ("We need to make it clear that the bylaws we saw were from 2006.").

239  2CR2532 (Birmingham e-mail).

240  *Id.*

241  2CR1556; 3CR5033.

242  491 U.S. 657 (1989).

243  *Id.* at 692.

to conduct a routine investigation by interviewing the key witness, listening to a recorded statement, or meeting with two sources who could verify the allegations, the newspaper purposefully avoided the truth, turning from facts that might have shown the allegations to be false.[244]

The U.S. Supreme Court found that "[t]he newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home also supports the finding of actual malice."[245] The Caller-Times had the entire tape-recording of the meeting, yet it did not accurately report facts it revealed. This shows the Caller-Times knew the truth and didn't report it, or was purposefully avoiding the truth. Either way, this is evidence of actual malice. At the very least, the newspaper negligently failed to correctly report the facts.

### 4. The Caller-Times recklessly or negligently relied on sources it should have known were questionable.

As the U.S. Supreme Court has held, a defamation defendant may be found to have acted recklessly or negligently "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[246] The Caller-Times says the initial source of the troubles in the Chamber of Commerce was Ruben Bonilla and cites the affidavits of Tom Whitehurst and Jamie Powell.[247]

---

244 *Id.*
245 *Id.* at 683.
246 *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).
247 ANTBrp30.

But Whitehurst identified only Sylvia Whitmore and Judy Hawley as sources.[248]

Powell said he had spoken to Bonilla on February 15, 2008, but did not say what was discussed.[249] Bonilla was not a primary source. The only information he provided is found in an article published on February 16.[250] He says nothing at all about the financial controversy in the Chamber of Commerce.[251] And he is never again referred to as a source. But Sylvia Whitmore, Judy Hawley, and Damon Bentley are repeatedly quoted in articles and mentioned in Caller-Times e-mails. Nothing shows Bonilla ever contacted the Caller-Times again. Instead the Caller-Times relied on questionable sources.

The Caller-Times had reason to doubt Judy Hawley's veracity or accuracy as a source. She told the Caller-Times that she was shocked by her dismissal from the Chamber's executive committee,[252] for which she blamed Carter.[253] She stated: "it was significant that she and Whitmore were the first order of business . . . instead of their concerns about financial practices."[254] She had no

---

248   1CR617–18 (Whitehurst affidavit).
249   1CR585–87.
250   1CR465.
251   *Id.*
252   1CR465 (article of 16 Feb. 2008, quoting Hawley).
253   1CR1007 (Hawley depo. p. 19, line 25; p. 20, lines 1–10). *See also* 1CR465 (article of 16 Feb. 2008, quoting Hawley).
254   1CR465 (article of 16 Feb. 2008, quoting Hawley).

direct knowledge of anything; she only knew what Damon Bentley had told her.[255]

Sylvia Whitmore was not a reliable source. She had been a member of the board until it was determined that under the bylaws, she was no longer eligible to serve.[256] Despite having the bylaws explained,[257] she was furious about her exclusion and remained so.[258] She blamed Carter even though he had not raised the question about her eligibility.[259] Whitmore became a "source" for the Caller-Times no later than February 15, 2008.[260] On that date, she sent the Caller-Times an e-mail about the Chamber's executive-board meeting[261] and immediately became a "reliable source."[262] She expressed in vague terms that she was concerned about the Chamber's finances.[263] Without trying to clarify the vagueness, the newspaper published her statements anyway. In one article, it presented as fact—despite the blatant contradiction—Whitmore's declaration

---

255  2CR2540, lines 1–20; 2CR2574, lines 5–7 & 20–22; 2CR2470 (citing Whitmore depo.; Hawley depo.) (both repeating what Bentley told them).
256  2CR2533.
257  *Id.* (some quotations from this e-mail are attributed to Huseman in the article: *see* Tom Whitehurst e-mail, 2CR2531).
258  *See, e.g.*, 2CR2536 (part of 15 Feb. 2008 e-mail from Sylvia Whitmore to Israel Saenz); 2CR1503, Appendix 3P (article, 29 Feb. 2008).
259  2CR2555, lines 10–17 (Whitmore depo.).
260  *See* 2CR2536 (part of 15 Feb. 2008 e-mail from Whitmore to Israel Saenz).
261  *See id.*
262  *See* 2CR2676 (21 Feb. 2008 e-mail from Aguilar, referring to "reliable source" and identifying source as "Sylvia").
263  *See* 2CR2536.

that Bentley had been denied access to the Chamber's accountant[264] and Bentley's statement about what he'd been told by that same accountant.[265] The Caller-Times has not plausibly explained why it ignored Whitmore's obviously false statement and reported it as fact.

Whitmore also gave Aguilar incorrect information about a Chamber member's resignation,[266] which Aguilar admittedly did not verify before it was published,[267] and serious backlash resulted.[268] Yet despite then knowing Whitmore to be a fallible source, Aguilar never confirmed Whitmore's accuracy on more important subjects—such as the contents of Carter's employment contract.

Whitmore "confirmed" to the Caller-Times that Carter's bonus depended on the Chamber's financial performance,[269] even though she had in fact never

---

264  2CR1503, Appendix 3P (article, 29 Feb. 2008) ("Whitmore said she was concerned about 'denying the treasurer access to . . . advice of financial professionals employed by the chamber of commerce.'").

265  *Id.* ("According to Bentley, the accountant told him . . . .").

266  *See* 2CR2676–77.

267  *See id.*

268  *See id. See also* 2CR1498, Appendix 3N.

269  2CR1503, Appendix 3P (Whitmore reiterating Bentley's claim that Carter's bonus was tied to Chamber's financial performance); 2CR2463 (Aguilar citing Whitmore as source).

seen the contract[270] and was only repeating Bentley's statements.[271] Aguilar never tried to contact Bentley to verify Whitmore's statement.[272]

The Caller-Times never sought a copy of Carter's employment contract. It relied only on Bentley's description of the contract.[273] But Bentley didn't accurately describe the contract he claimed to have seen.[274]

- The original contract promised a performance bonus based on attaining financial goals set forth in "Attachment C."[275] There was no Attachment C,[276] and there never had been.

- Neither Attachment A[277] nor Attachment B lists any financial performance objectives.[278]

- Bentley admitted seeing the 2005 amendment (Amendment to Employment Contract),[279] promising a performance bonus "based on the attainment of financial goals" set forth in "Attachment C,"[280] which still did not exist.

- Bentley did not mention the February 2007 amendment (Amendment Number 2 to Employment Contract),[281] which gave Carter a

---

270   2CR2540 (Whitmore depo.: admitting she never reviewed Carter's contract).

271   2CR2524 (Bentley e-mail inaccurately describing contract); 2CR2503 (Bentley describing contract in part without referring to amendments); 2CR2663 (Bentley e-mail: failing to mention second amendment to contract). *See also* 2CR2515, lines 12–25 (Hawley depo.) (waffling on performance link to bonus).

272   2CR2461 (Aguilar affidavit).

273   2CR2524; 2CR2663.

274   2CR2524 (Bentley e-mail inaccurately describing contract); 2CR2687 (Bentley's amended affidavit, acknowledging he saw all provisions and *both amendments*); 2CR2695 (copy of contract attached to Bentley affidavit).

275   2CR2332, lines 4–8.

276   2CR2524 (Bentley e-mail stating "contract has an attachment C [it doesn't] but unfortunately it is blank").

277   2CR2337.

278   2CR2338–40.

279   2CR2341–42.

280   2CR2342.

281   2CR2343–44.

"performance" bonus *and did not mention financial goals or Attachment C.*[282] Bentley also did not mention that he had seen the amendments.[283]

This evidence objectively shows that Carter's contractual bonus was *not* linked to the Chamber's 2007 financial performance. The Caller-Times could have easily verified this by actually obtaining a copy of the contract, but made no attempt to do so. It repeatedly published falsehoods.

Damon Bentley, a "source" who talked directly to the Caller-Times about the dispute,[284] was known to be untrustworthy. Most of the disparaging articles "particularly relied" on Bentley as a source and for information[285] despite the reporters' never attempting to verify his statements.[286]

Bentley had become the Chamber's treasurer in August 2007.[287] After the Crosstown Commons episode, but before the Caller-Times attacked Carter, Bentley was involved in a scandal that could have affected the public's perception of his trustworthiness. Here is what the record shows. Mauricio Celis was, among other things, Damon Bentley's partner in Utopia World Cuisine restaurant.[288] On September 15, 2007, Bentley and his girlfriend spent an evening

---

282  *Id.*
283  2CR2687.
284  *See, e.g.,* 1CR1493, Appendix 3L (confirming that Bentley spoke to Caller-Times).
285  2CR2461 (Aguilar affidavit); 2CR2488, lines 20–23 (Aguilar depo.) ("I took Mr. Bentley's word for it").
286  *Id.*
287  2CR2498, lines 15–20 (Bentley depo.).
288  2CR2495, lines 3 & 8–9 (Bentley depo.).

at Utopia drinking with Celis. They went to Celis's home around 2 a.m.[289] Celis, Bentley, and Bentley's girlfriend were all naked and using the hot tub or swimming pool.[290] Two hours later, the woman was sprinting naked from Celis's house to a convenience store over a mile away, where the police were called.[291] Bentley and Celis arrived shortly after.[292]

The Caller-Times reported that the responding police officer said that the woman had fled Celis's house when one of the men—not Celis—had attempted to have sex with her.[293] Celis, clad in a bathrobe, flashed a badge and tried to persuade the officer to release the woman into his custody.[294] The officer refused.[295]

This sexcapade involved local political, social, and law-enforcement figures—a newsworthy event—but the Caller-Times did not report it until October 26, 2007, well over a month later.[296] It never mentioned Bentley by name. Although he was named in the police report, the Caller-Times referred to him only as "the other man" in the many ensuing articles about the investigations, indictments, and court hearings.[297] The Caller-Times never

---

289   2CR2504, lines 1–13 (Bentley depo.).
290   *Id.*, lines 19–25 (Bentley depo.).
291   2CR1484, Appendix 3I (articles, 26 Oct. 2007).
292   *Id.*
293   *Id.*
294   *Id.*
295   *Id.*
296   *Id.*
297   2CR2506, lines 19–22 (Bentley depo.).

articulated a legitimate, nonculpable excuse for its favoritism toward Bentley, who became the Caller-Times' main "source" against Carter. Nor did it report that Bentley, as treasurer, had consistently approved Carter's detailed monthly financial reports until January 2008.[298]

Instead, the Caller-Times consistently cast Bentley in a heroic light, quoting him: "[I am] personally . . . committed to the success of the chamber of commerce and we need to make sure that the decisions we make move the chamber in a direction that is positive for this city."[299] But it goes further. The Caller-Times portrayed Bentley as recoiling from Carter's alleged financial "irregularities" to get an unearned bonus[300] (which could result in felony charges),[301] fighting to recover a tape he claimed Carter had stolen[302] (though he knew Carter did not have it),[303] striving to protect the tape from destruction when it was safe,[304] being appointed to the Chamber's audit committee[305] (he was not, and the Caller-Times did not ask why not),[306] and gallantly "declining to

---

298   *See* 2CR2687–88 (Bentley affidavit) (Acknowledging membership on Board of Directors). *See also* 2CR2684–85 (Carter's first affidavit).
299   2CR1487, Appendix 3K (article, 15 Feb. 2008); 2CR1493, Appendix 3L (article, 16 Feb. 2008) (confirming Bentley spoke to Caller-Times).
300   2CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008); 2CR1508, Appendix 3R (article, 3 Mar. 2008); 2CR1511, Appendix 3S (article, 4 Mar. 2008); 2CR1514, Appendix 3T (article, 8 Mar. 2008).
301   Tex. Penal Code §§ 31.03, 32.32, 32.45.
302   2CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008); 2CR1516, Appendix 3U (article, 19 Mar. 2008).
303   2CR2721 (Bentley e-mail).
304   2CR1516, Appendix 3U (article, 19 Mar. 2008).
305   2CR1498, Appendix 3N (article, 21 Feb. 2008).
306   3CR4861 (Bentley's letter denying appointment).

surrender" a paper copy of the PowerPoint presentation he'd just made to the Chamber.[307]

Some members of the public learned of Bentley's adventure and questioned his veracity.[308] For example, one commenter wrote: "Bentley is the epitome of the pot calling the kettle black. What he was involved with Celis in, i.e. the hot tub, is not the way an upstanding person handles themselves. Whatever the others were doing, Bentley is obviously not clean either."[309] Although the Caller-Times knew the doubts about its prime source,[310] it remained silent.

Another obvious reason to doubt Bentley's veracity was that as a board member, he received monthly financial statements from Carter and never raised any concerns or complaints.[311] He approved them all.[312] Bentley even presented some of these reports. Yet in January 2008, Bentley suddenly expressed concern when Carter's contract came up for review.[313] He didn't know the Chamber's accounting system and procedures.[314] He had access to the documents related to

---

307   2CR1498, Appendix 3N (article, 21 Feb. 2008).
308   *See, e.g.*, 2CR2539; Appendix 4 (John Kelley, "Opponents described as 'lynch mob,'" *We the People*, 2 Apr. 2008) ("Bentley seems to have a special pass from the Caller-Times."). *See also* 2CR2682 (asking "is Bentley an auditor? I'm confused.").
309   2CR2539.
310   2CR2664 (e-mail to Birmingham: "Bentley seems to have a special pass from the Caller-Times"); 2CR2672 (e-mails from Shane Fitzgerald about online comments).
311   2CR2684; 4CR5401 (Carter's first affidavit).
312   4CR5401.
313   2CR1487, Appendix 3K (article, 15 Feb. 2008).
314   2CR2498, lines 22–25; 2CR2499, line 1 (Bentley depo.) (admitting no knowledge).

the matters he perceived were financially wrong.[315] The CPA he consulted would not and did not say there were serious problems and would not give a professional opinion.[316] Bentley alone, without support, decided there was a crucial problem.[317] The Caller-Times ignored Bentley's obvious failure as a director and as Chamber treasurer to notice any problems sooner and reported all his words as facts.[318]

One reasonable inference is that the Caller-Times was protecting Bentley's credibility in an effort to multiply the harm he could inflict on Carter. Another inference is that Birmingham knew he could use Bentley to frame Carter as early as September 15, and this is why he protected his future "source."

Because this is a review of an unsuccessful summary-judgment motion, all inferences must be drawn in Carter's favor. They raise a triable fact question about whether the Caller-Times published with actual malice or, at the very least, was negligent. A reasonable jury could find the Caller-Times was taking the word of informants that it knew were not reliable or trustworthy and ignoring known reliable evidence and a very available source—Birmingham—who could have revealed the falsity of the statements about Carter. After Birmingham specifically

---

315   2CR2500, lines 23–25 (Bentley depo.).
316   2CR2501, lines 1–25; 2CR2502, lines 1–4.
317   2CR2502, lines 5–14.
318   *See, e.g.*, 2CR1487, Appendix 3K (article, 15 Feb. 2008); 2CR1500, Appendix 3O (article, 27 Feb. 2008); 2CR1503, Appendix 3P (article, 29 Feb. 2008); 2CR1506, Appendix 3Q (editorial, 2 Mar. 2008).

told the Chamber to "remove" the Caller-Times from e-mail distributions, member lists, and contact lists, the Chamber did so.[319] The Caller-Times' action blocked it from getting information from the Chamber or Carter. This evidence of the Caller-Times' purposeful avoidance is some evidence of a reckless disregard of the truth and actual malice.

A reasonable jury could also conclude the newspaper was deliberately waging war against Carter through known lies—or, at the very least, acted negligently by ignoring the facts it possessed, failing to investigate to determine the truth.[320]

The Caller-Times declares that there is no evidence of negligence because "it is undisputed that the Articles were published with diligence, balance and in accord with standard journalistic practices and customs."[321] But Carter has disputed that all along, and the Caller-Times cites nothing to the contrary. The only "support" the Caller-Times cites is the affidavits of its former and present employees and an expert report by Tony Pederson.

Professor Pederson based his opinions that the Caller-Times did not act with malice or negligence on incomplete and inaccurate information. His conclusions are unreliable because Pederson was not informed about material

---

319   3CR4604.

320   *See* 2CR1556 (John Kelley, "Opponents described as 'lynch mob,'" *We the People*, 2 Apr. 2008).

321   ANTBrp84.

facts, such as the backgrounds of the Caller-Times' sources and the existence of personal animosity towards Carter. For example, Pederson mentions nothing about the fact that Whitmore and Hawley were angered by Carter's (justified) effort to remove them from the executive council. He did not mention that Whitmore's and Hawley's information was secondhand[322] and not verified by the Caller-Times. He does not mention the fact that the Caller-Times withheld—and was still withholding—Bentley's name from the public, with no explanation, even though the scandal could bear on the public's perception of Bentley's integrity.[323] It is established that the public should know about a source's talents, education, experience, and motives because these "'help the public formulate some judgment' about the controversy,[324] and 'could have been relevant to the public's decision whether to listen to him.'"[325] He does not mention Patrick Birmingham's animosity toward Carter or the Caller-Times' very noisy and public withdrawal from the Chamber of Commerce. And he does not mention that Aguilar—who wrote 18 of the 25 articles and contributed to others[326]—and Birmingham were upset because Carter had given Aguilar a "dressing down."[327]

---

322  2CR2540, lines 1–20; 2CR2574, lines 5–7 & 20–22; 2CR2470 (citing Whitmore depo.; Hawley depo.) (both repeating what Bentley told them).

323  2CR1351–54.

324  *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998).

325  *Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287, 1298 (D.C. Cir. 1980).

326  2CR2484, lines 13–25; 2CR2485, lines 3–25 (Aguilar depo.). *See also* 2CR1490 (16 Feb. article).

327  4CR6520, lines 20–25; 4CR6521, lines 1–9 (describing "dressing down").

If Pederson had known those facts, he likely would not have concluded that "there was nothing of a personal nature in the criticism of Carter" or that the articles contained "nothing that could be construed as 'vitriolic.'"[328] In fact, he says that "there is nothing in the stories or the record to indicate the sources were acting in bad faith."[329]

Pederson based his opinion that the Caller-Times did not act with malice or negligence on what the Caller-Times told him about Carter's contract. He never saw a copy of it, and neither did the Caller-Times—it relied solely and unquestioningly on Bentley's description of the contract, which was materially inaccurate[330] and published Bentley's statements as facts.

Pederson also concluded that the Caller-Times acted without malice by relying on information provided by Hawley and Whitmore.[331] He does not say explain how the Caller-Times could properly base its statements about the building fund on information from Hawley and Whitmore—neither of whom had actual knowledge about it[332]—and fail to verify it, especially knowing that Whitmore had previously given Aguilar grossly inaccurate information before.[333] The Caller-Times based its statements about the terms of Carter's employment

---

328    1CR664.
329    *Id.*
330    See pp. 44–45 of this brief.
331    2CR2470 (citing Bentley, Whitmore, and Hawley depos.).
332    2CR2540, lines 1–20; 2CR2574, lines 5–7 & 20–22; 2CR2470 (citing Whitmore depo.; Hawley depo.) (both repeating what Bentley told them).
333    *See* 2CR2676–77. *See also* 2CR1498, Appendix 3N.

contract on "information" from Whitmore, who possessed limited, secondhand (and inaccurate) knowledge of the terms, and from Hawley, who knew even less.[334]

Pederson does not address the Caller-Times' repeated failures to verify facts and publication of facts it knew were false other than to say that "nothing stands out as lacking in conformance with journalistic standards or professionalism" and that the newspaper had "solid sourcing"[335] despite the facts that Hawley and Whitmore lacked actual knowledge[336] and that Bentley's information in particular was based on improper methodology[337] and unsupported by an accountant.[338] Pederson seems not to have known those facts—any many other material facts—before formulating his opinions and conclusions.

Pederson's expert report is unreliable and does not support finding that the Caller-Times acted without malice or was not negligent.

---

334  2CR2492, lines 12–25.

335  1CR665.

336  2CR2540, lines 1–20; 2CR2574, lines 5–7 & 20–22; 2CR2470 (citing Whitmore depo.; Hawley depo.) (both repeating what Bentley told them).

337  2CR2578, lines 12, 15–16 (stating, "I'm not a CPA. . . . That's why I asked a CPA to be here."); 2CR2493, lines 15–17; 2CR2494, lines 9, 13–16 (Bentley depo. excerpt: not mentioning qualifications in finance or accounting); 2CR2498, lines 15–25; 2CR2499, line 1 (Bentley depo. excerpt: no knowledge of Chamber's accounting method or procedures); 2CR2591, lines 20–25; 2CR2592, lines 1–6 (confusing three different accounting methods and denying the correct method: modified accrual).

338  2CR2501, lines 8–25; 2CR2502, lines 1–4 (Bentley depo.) (acknowledging that accountant's statements were general, based on insufficient information, and not a professional opinion).

There is ample evidence in the record that Birmingham, the Caller-Times' publisher, and at least one reporter, Aguilar, held personal grudges against Carter, that the Caller-Times' reporters and editors ignored and manipulated facts or—at the very least—failed to follow up on blatant contradictions in the "facts" and depended on assertions they knew or should have known were unreliable or of doubtful veracity.

## C. A jury could find from the evidence that there was a conspiracy to defame Carter, to prevent the Chamber from renewing Carter's employment contract, and to drive him to resign.

The Caller-Times challenges Carter's tort claims as unsupported by any evidence.[339] Carter's nondefamation claims are based on information-gathering and the publication of the defamatory articles.[340]

A civil conspiracy consists of: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. A conspiracy is usually proved by circumstantial evidence.[341]

Birmingham stated that he met with Hawley, Whitmore, and one or two other board members privately in his office.[342] The date is not clear, but it was

---

339  ANTBrp90.
340  1CR912.
341  *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963).
342  4CR6519, lines 5–25; 4CR6520, lines 18–25 (Birmingham depo.).

after the Caller-Times withdrew from the Chamber of Commerce.[343] Birmingham mentions a television interview in which he alleged that Carter had "said some things that I thought were hurtful about me and the paper."[344] He aired his "concerns" about Carter but waffled on what exactly those concerns were.[345] He specifically stated only that he was upset about Carter's "dressing down" a reporter[346] and how Carter was referring to the Caller-Times but did not elaborate on his meaning.[347] Birmingham stated that "there was a general consensus" among those at the meeting and that everyone "acknowledged and recognized" his concerns.[348] Reluctantly, he admitted that they agreed with him about something but did not elaborate on just what it was.[349]

Birmingham learned on February 15 that he was not the only one who'd be happy to see Carter lose his job. Libby Averyt told him that some members of the Chamber's executive committee wanted Terry Carter fired.[350] The transcript of the taped executive-committee meeting shows that only one

---

343   2CR2570, lines 11–21 (Whitmore depo.).
344   4CR6517, lines 21–25; 4CR6518, lines 1–14 (mentioning meeting with executive council and membership-renewal bill); 4CR6555, lines 21–25; 4CR6556, lines 1–2 (referring to withdrawal and interview).
345   4CR6520.
346   *Id. See also* 2CR2571, lines 24–25; 2CR2572, line 1 (Whitmore depo.).
347   4CR6520.
348   *Id.*
349   *Id.*
350   2CR2490 (e-mail from Ayert).

member—Bentley—had decided on dismissal.[351] Judy Hawley recommended giving Carter a "leave," take away an allowance, and "get him out of this situation"[352] or else "removing" him until an audit was done.[353] And Whitmore and Hawley both blamed Carter for the shock of being told they couldn't serve on the Chamber's executive committee.[354] They all had reasons to want Carter neutralized or eliminated.

Immediately after Birmingham learned about the accusations of financial misdeeds[355] and that some members of the Chamber's executive committee wanted Terry Carter fired,[356] the Caller-Times began a "Terry Carter Watch for Resignation."[357]

The Caller-Times had long kept secret Bentley's identity as the "other man" in the sexcapade. Over the four months of articles, it would cast him in the role of hero. Birmingham told his staff that he had been given information about "funny stuff . . . with [the Chamber's] finances,"[358] which formed the basis

351   2CR2632, lines 9–10 ("if the CEO is treating me like that, that, to me, is grounds for dismissal"); 2CR2634, lines 14–15 ("My recommendation for dismissal . . . .").
352   2CR2619, lines 22–23; 2CR2320, lines 1–3.
353   2CR2622, line 25; 2CR2623, lines 1–2.
354   1CR1007 (Hawley depo. p. 19, line 25; p. 20, lines 1–10); 2CR2555, lines 10–17 (Whitmore depo.). *See also* 1CR465 (article of 16 Feb. 2008, quoting Hawley).
355   2CR2468 (e-mail from Birmingham to Powell and Averyt).
356   2CR2490 (e-mail from Averyt to Birmingham).
357   2CR2536–37 (internal e-mail headings in exchanges between Mike Baird, Beth Francesco, Tom Whitehurst, Israel Saenz, and Elvia Aguilar).
358   2CR2468 (e-mail from Birmingham to Powell and Averyt).

of the first article published on February 15, including claims of shouting.[359] The article stated that Whitmore and Hawley could not be contacted.[360] So the only possible source of that information was Damon Bentley, who raised questions to the Chamber's executive council on February 15 and spoke to the Caller-Times that day.[361]

Finally, Birmingham and Caller-Times reporter Elvia Aguilar were both upset with Carter for publicly "dressing down" Aguilar in mid-2007.[362] Months later, Birmingham was still steaming about it.[363] When Birmingham was informed of "funny stuff going on with [the Chamber's] finances,"[364] which Whitmore made vague statements about a few days later,[365] Aguilar almost immediately became close with Whitmore as a "reliable source."[366] Of the 25 articles that followed, Aguilar wrote 18 of them, many containing unverified false statements. She stopped writing when Carter's resignation was imminent.[367]

---

359  2CR1491.

360  *Id. See also* 2CR2626, lines 9–12 & 15–17 (Whitmore declaring that information had not been disclosed).

361  *See* 2CR2626, lines 18–19 (Bentley's limited admission of disclosure).

362  4CR6520, lines 20–25; 4CR6521, lines 1–9) (describing "dressing down").

363  2CR2571, lines 24–25; 2CR2572, line 1 (Whitmore depo.).

364  2CR2532 (e-mail).

365  2CR2536 (part of 15 Feb. 2008 e-mail from Whitmore to Israel Saenz: Whitmore expressing in vague terms that she was concerned about the Chamber's finances).

366  *See* 2CR2677; 2CR2676.

367  *See* 2CR1540 (last article by Aguilar); 2CR1542–55 (all later articles written by Mary Ann Cavazos).

The apparent objective was to prevent the Chamber of Commerce from renewing Carter's contract and to drive Carter to resign. Immediately after Bentley and Whitmore gave the Caller-Times inside information about Bentley's questionable concerns, Caller-Times staff members began sending e-mails with the subject line "Terry Carter Watch for Resignation,"[368] even though the Chamber of Commerce board had not even thought of asking for Carter's resignation. The apparent means was a drawn-out smear campaign in which false statements were repeated and the worst possible light shed on Carter.

Whitmore, Hawley, and Bentley gave the Caller-Times the information for the February 15, 2008 article titled "Financial, Management Questions Raised at CC."[369] Whitmore sent the Caller-Times an e-mail about the Chamber's executive-board meeting[370] and immediately became a "reliable source."[371] All three of them knowingly or recklessly repeatedly fed distorted, inaccurate, and false information and statements to the Caller-Times, which published it. Eventually they achieved the objective revealed by the Caller-Times e-mail: through a continual drumbeat of accusatory news items, Terry Carter (who

---

368   2CR2536–37.
369   2CR1491–92.
370   *See* 2CR2536 (part of 15 Feb. 2008 e-mail from Whitmore to Israel Saenz).
371   *See* 2CR2677 (21 Feb. 2008 e-mail from Aguilar, referring to "reliable source"); 2CR2676 (identifying source as "Sylvia").

would later be exonerated) was pressured into resigning from the Chamber of Commerce.[372]

Evidence of an agreement, followed by coordinated illegal conduct, is some evidence of a civil conspiracy to commit tortious interference and defamation. With this evidence, a jury could find that the Caller-Times defamed Carter and tortiously interfered with Carter's employment contract and relationship with the Chamber.[373] These claims must be remanded.

## D. Because the owner of a media outlet is liable for the outlet's wrongful act, Scripps is liable for the Corpus Christi Caller-Times' defamatory articles.

The owner of a media outlet is liable for the wrongful actions of that outlet,[374] including publishing defamatory statements made by the outlet or republishing defamatory statements made by others.[375] As owner of the Corpus Christi Caller-Times, Scripps has republisher liability. Also, Birmingham swears he is an officer of defendant/appellant Scripps.[376] Therefore Scripps has *respondeat superior* liability for his defamation and other wrongful conduct because "[t]he defamatory statements made by a servant speaking within the scope of his

---

372 *See* 2CR4958.

373 *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 82 (Tex. 2000).

374 *See Zacchini v. Scripps-Howard Broadcasting, Inc.*, 351 N.E.2d 454, 455 (Ohio 1976) (noting that Scripps-Howard Broadcasting owned the television station accused of misappropriation of property).

375 *Neely*, 418 S.W.3d at 61 (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973)).

376 3CR3847.

employment but with a bad motive subjects the corporation to liability."[377]

Evidence also shows that Scripps publishes the online version of the Caller-Times,[378] which included the defamatory articles. For all these reasons, Scripps has republisher liability.

## Conclusion

Mark Twain is said to have quipped, "Never argue with a man who buys ink by the barrel."[379] Birmingham made good on this threat to Carter.[380]

Birmingham and Aguilar published many devastating lies about Carter to eliminate him from his position as CEO. Carter has a highly protected right to vindicate the truth and save his reputation. This Court should dismiss this appeal or remand for a jury trial.

Respectfully submitted,

/s/ Craig S. Smith
Craig Smith

---

377   *Hooper-Holmes Bureau*, 161 F.2d at 104 (citing Restatement (First) of Agency § 247 cmt. c (1933); 19 C.J.S. *Corporations* § 1280).

378   3CR3862.

379   *See Brown v. Kelly Broad. Co.*, 48 Cal. 3d 711, 744 (Cal. 1989) (crediting Twain). N.B.: scholars argue over the attribution.

380   2CR2477 (Plaintiff's Amended Consolidated Summary Judgment Response).

**Certificate of Service and word count**

I certify that on May 12, 2016, a true and correct copy of this brief was served on the following by email. I certify that this brief was typed in 14-point Garamond font in the text and 12-point font in the footnotes, and contains 10583 relevant words.

/s/ Craig S. Smith
Craig Smith

Paul C. Watler
Shannon Zmud Teicher
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
Tel.: (214) 953-6000
Fax: (214) 661-6669
E-mail: pwatler@jw.com

Jorge C. Rangel
Jaime S. Rangel
THE RANGEL LAW FIRM, P.C.
615 N. Upper Broadway St., Suite 2020
P.O. Box 2683 (78403)
Corpus Christi, Texas 78401
Tel.: (361) 883-8500
Fax: (361) 883-2611
E-mail: jorge.c.rangel@rangellaw.com